# STATE OF NORTH DAKOTA, Respondent, v. W. V. O'CONNOR, Appellant.

(226 N. W. 601.)

Opinion filed August 17, 1929.

*Divet, Shure, Murphy & Thorp,* for appellant.

*James Morris,* Attorney General, *William C. Green,* Special Assistant Attorney General, and *J. B. Wineman,* State's Attorney, for respondent.

CHRISTIANSON, J. The defendant was convicted of the crime of embezzlement and appeals from the judgment of conviction. The indictment charges: "That W. V. O'Connor did, in the county of Grand Forks, state of North Dakota, on the 25th day of August, A. D. 1923, commit the crime of embezzlement, committed as follows, to wit:—

"That on the said 25th day of August, A. D. 1923, the First Savings Bank was, and for a long time prior thereto had been a state savings bank association, duly organized and existing as a corporation under and by virtue of the laws of the state of North Dakota, and engaged in the banking business at the city of Grand Forks, county of Grand Forks, state of North Dakota, and that on said day and during all of said time the defendant, W. V. O'Connor, was an officer of the said First Savings Bank, to wit: a Director and Treasurer thereof; that on the said 25th day of August, A. D. 1923, the said W. V. O'Connor being then and there such Director and Treasurer of the said First Savings Bank of Grand Forks, North Dakota, as aforesaid, did in and by virtue of his said office, trust and employment, receive and take into his possession and have under his control $4,731.45 in property, consisting of money, bank notes, and other funds, a more particular description of which is to the grand jury unknown, all then and there the property of and belonging to the said First Savings Bank of Grand Forks, North Dakota, for and in the name and on the account of the said First Savings Bank of Grand Forks, North Dakota, worth and of the value then and there of the sum of $4,731.45; that afterwards, to wit: on the 25th day of August, A. D. 1923, the said W. V. O'Connor did then and there wilfully, knowingly, fraudulently and feloniously

embezzle and convert the same to his own use, and did then and there, wilfully, knowingly, fraudulently and feloniously appropriate the same to a use and purpose not in the due and lawful execution of his trust; this contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of North Dakota."

On being arraigned the defendant demurred to the indictment on the grounds, among others (1) That it does not state facts sufficient to constitute a public offense; and (2) That it does not substantially conform to the requirements of the Code of Criminal Procedure. The demurrer was overruled; thereupon the defendant entered a plea of not guilty and the issue thus framed was submitted to a jury which returned the following verdict: "We, the jury, empanelled and sworn to try the above entitled action, do find the defendant guilty and recommend leniency."

The defendant moved for a new trial and in arrest of judgment; both motions were denied and he was sentenced pursuant to the verdict.

■ The first contention advanced by the appellant is that the demurrer to the indictment, and the motion in arrest of judgment were well founded and that the trial court erred in overruling the demurrer and in denying the motion in arrest of judgment. The specific attack on the indictment is leveled at the description of the property charged to have been embezzled. It is asserted that the description of the property is so vague, uncertain and indefinite as to invalidate the indictment. In appellant's brief it is said: "The essence of this objection (the objection raised by the demurrer and the motion in arrest of judgment) is that the term 'fund' or 'other funds' as therein used is too general or indefinite as a description of the property said to be embezzled and its inclusion invalidates the entire indictment."

Our statutes (Comp. Laws 1913) provide:

"Sec. 9931. If any person, being an officer, director, trustee, clerk, servant or agent of any association, society or corporation, public or private, fraudulently appropriates to any use or purpose not in the due and lawful execution of its trust, any property which he has in his possession or under its control in virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, he is guilty of embezzlement."

"Sec. 9936. A distinct act of taking is not necessary to constitute embezzlement, but any fraudulent appropriation, conversion or use of property coming within the above prohibitions is sufficient."

"Sec. 10,685. The information or indictment must contain: 1. The title of the action, specifying the name of the court to which the information or the indictment is presented, and the names of the parties. 2. A statement of the acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended."

"Sec. 10,693. The information or indictment is sufficient if it can be understood therefrom: . . . 6. That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.

"7. That the act or omission charged as the offense, is stated with such a degree of certainty as to enable the court to pronounce judgment upon a conviction, according to the right of the case."

"Sec. 10,701. In an information or indictment for larceny or embezzlement of money, bank notes, certificates of stock or valuable securities, or for a conspiracy to cheat and defraud a person of any such property, it is sufficient to allege the larceny or embezzlement, or the conspiracy to cheat and defraud, to be of money, bank notes, certificates of stock or valuable securities, without specifying the coin, number, denomination or kind thereof."

The indictment in this case did not follow the language of the statute in describing the property charged to have been embezzled. Instead of charging the embezzlement of "money, bank notes and valuable securities" it charged the embezzlement of "money, bank notes and other funds." The term "funds" has a variety of meanings. The sense in which it is employed in a statute or in a pleading must be gathered from the context. (27 C. J. pp. 926, 927. See also People v. McKinney, 10 Mich. 54.) It is not a legal term with a settled meaning; but is a term in common use, especially as regards public officers (People v. McKinney, 10 Mich. 55, 90) and banking institutions. As so used it is generally understood as meaning the quick capital or available assets of the bank. Funk & W. New Standard Dict. When used alone, that is, when reference is made generally to

the "funds" of a bank it doubtless includes money and bank notes; but when used in connection with these terms it must be deemed to refer to assets other than moneys or bank notes. When used in this manner it is synonymous with quick assets of the bank, other than money or bank notes, and has reference to and includes cash items, and valuable securities such as government, state, county, or municipal bonds or obligations and other forms of obligations and securities in which investment of a bank's funds may be made. United States v. Smith (D. C.) 152 Fed. 542, while there are authorities holding that the use of the term "funds" renders an indictment for embezzlement defective, we have been unable to find any authorities to that effect in a jurisdiction having a statute like ours, which clearly indicates a legislative intention that as regards property charged to have been embezzled an indictment or information for embezzlement need not describe the property with particularity but may describe it in general terms. Under our laws "it is not necessary that the specific property appropriated should be identified, and that the prosecution should be based on the specific misappropriation of the aggregate sum charged." State v. Bickford, 28 N. D. 37, 69, 147 N. W. 407, Ann. Cas. 1916D, 140.

It has been said that all that is necessary as regards the description of property charged to have been embezzled "is that the property must be described with sufficient certainty to enable the court to determine that the property is in law a subject of the crime charged in the indictment, and to enable the jury to discern that the property proved to have been feloniously taken is the same which is mentioned in the indictment." United States v. Jones (D. C.) 69 Fed. 973, 982. See also 8 Standard Proc. p. 231; Davis v. State, 196 Ind. 213, 147 N. E. 770.

The authorities generally recognize that in an indictment against a public officer or an officer of a corporation, greater latitude is permitted "in the description of the money or funds embezzled." People v. McKinney, 10 Mich. 54; State v. Leonard, 56 Wash. 83, 105 Pac. 163, 21 Ann. Cas. 69; Jackson v. State, 76 Ga. 551; 7 Enc. Pl. & Pr. p. 430; Breese v. United States, 45 C. C. A. 535, 106 Fed. 680.

In Breese v. United States, supra, the court had under consideration the sufficiency of an indictment charging the president of a national

banking corporation with embezzlement. The indictment in that case followed the words of the statute and charged the defendant in the several counts, at times with embezzling, at other times with abstracting and at other times with misapplying, the funds of the bank without specifying how much were moneys, how much were funds, and how much were credits. The indictment was attacked on the ground that the description of the property was insufficient. In considering this contention the court (106 Fed. 688) said:

"The rule is thus stated in United States v. Simmons, 96 U. S. 360, 24 L. ed. 819: 'Where the offense is purely statutory, having no relation to the common law, it is, as a general rule, sufficient in the indictment to charge the defendant with acts coming fully within the statutory description in the substantial words of the statute, without any further expansion of the matter. But to this general rule there is the qualification, fundamental in the law of criminal procedure, that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense and plead the judgment as a bar to any subsequent prosecution for the same offense. An indictment not so framed is defective, although it may follow the language of the statute.'

"The indictment in this case fully apprises the accused of the nature of the accusation against him. Is it necessary to state how much of the embezzlement was of moneys, how much of funds, and how much of credits? Inasmuch as the accused was president of the bank, in charge, or, at least, placed in supervision, of its assets, and as the charges against him are of transactions in small amounts, occurring on several days, such particularity is evidently impossible. Were this demand enforced, the government would be entrapped into making allegations which it would be impossible to prove. Evans v. United States, 153 U. S. 584, 38 L. ed. 830, 14 Sup. Ct. Rep. 934, 9 Am. Crim. Rep. 668. The use of these words, notwithstanding their generality, was sustained in United States v. Voorhees (C. C.) 9 Fed. 143. They were used in many cases before the Supreme Court, and no objection was taken. Evans v. United States, supra; United States v. Northway, 120 U. S. 327, 30 L. ed. 664, 7 Sup. Ct. Rep. 580; Batchelor v. United States, 156 U. S. 429, 39 L. ed. 478, 15 Sup. Ct. Rep. 446; Coffin v. United States, 156 U. S. 433, 39 L. ed. 482, 15

Sup. Ct. Rep. 394. The rule is well stated in Cochran v. United States, 157 U. S. 290, 39 L. ed. 705, 15 Sup. Ct. Rep. 630: 'Few indictments under the national banking law are so skillfully drawn as to be beyond the hypercriticism of astute counsel; few which might not be made more definite by additional allegations. But the true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' "

The indictment in this case charges that the defendant was the treasurer of the savings bank; that by virtue of such office he received, took into his possession, and had under his control, money, bank notes, and other funds, property of the bank, of the value of $4,731.45; and that he wilfully, knowingly, fraudulently and feloniously, embezzled and converted the same to his own use.

We are agreed that the property charged to have been embezzled was described with sufficient certainty to apprise the defendant of the accusation against him; to enable the court to determine whether such property was subject of embezzlement; to enable the jury to discern that the property referred to in the evidence as having been feloniously taken is the same as that mentioned in the indictment; to enable the court to pronounce judgment upon conviction according to the right of the case; and that the verdict under the indictment in this case would be available to the defendant under a plea of former acquittal or conviction as a bar to another prosecution for each and every act for which he was tried in this case.

■ It is next contended that the court erred in allowing the state certain peremptory challenges to jurors in excess of those provided by law. The question of the number of peremptory challenges to which the prosecution was entitled, arises because of an amendment to the statute. Section 10,805, Comp. Laws 1913 allowed the state to challenge peremptorily five jurors in prosecutions for offenses punishable by imprisonment in the penitentiary. This section was amended by the legislative assembly in 1927 so as to allow the state to challenge peremptorily ten jurors in such cases. Laws 1927, chap. 218, § 2. The

latter law was in force at the time of the trial of this action, but the defendant contends that inasmuch as the offense charged was committed before the enactment of such law it could not constitutionally apply to the present case; and that if such law were intended to be applicable to offenses committed before its enactment, it becomes and is an ex post facto law within the meaning of § 10, article 1, of the Constitution of the United States. It is unnecessary to determine the constitutional question thus urged. The record in this case shows that the state was permitted to challenge seven jurors peremptorily. It does not show whether the defendant challenged any jurors peremptorily; and so far as the record shows the defendant did not challenge or object to any member of the trial jury. There is nothing to indicate that the discharge of the jurors peremptorily challenged by the state operated to the prejudice of the defendant. Upon this record it becomes wholly immaterial whether there was or was not any law authorizing the state to challenge peremptorily the two jurors discharged.

"The right of peremptory challenge is not of itself a right to select, but a right to reject jurors." United States v. Marchant, 12 Wheat. 480, 6 L. ed. 700.

"No party can acquire a vested right to have a particular member of the panel sit upon the trial of his cause until he has been accepted and sworn. It is enough that it appear that his cause has been tried by an impartial jury. It is no ground of exception that, against his objection, a juror was rejected by the court upon insufficient grounds, unless, through rejecting qualified persons, the necessity of accepting *others* not qualified has been purposely created. Thus, in the process of impaneling, no party is entitled, as of right, to have the *first juror* sit who has the statutory qualifications; though there are authorities to the contrary, chiefly based on exaggerated views of the rights of the accused in criminal trials. But this is on principle quite untenable; since, if the prisoner has been tried by an impartial jury, it would be nonsense to grant a new trial or a *venire de novo* upon this ground in order that he might be again tried by another impartial jury. . . . Finally, it is a rule of paramount importance that errors committed in overruling challenges for cause are not grounds of reversal, unless it be shown an objectionable juror was forced upon the

challenging party after he had *exhausted his peremptory challenges;* if his peremptory challenges remained unexhausted, so that he might have excluded the objectionable juror by that means, he has no ground of complaint." 1 Thomp. Trials, 2d ed. § 120.

"The erroneous disallowance of a challenge for cause in criminal cases is harmless if it does not appear that an objectionable juror was forced upon the defendant. Thus if the defendant has not exhausted all of his peremptory challenges he may not complain; it must affirmatively appear that some juror was forced upon the defendant against his objection. A similar rule prevails when the prosecution is erroneously permitted peremptorily to challenge a juror." 15 Cal. Jur. p. 432.

See also United States v. Marchant, supra; Stevens v. Union R. Co. 26 R. I. 90, 66 L.R.A. 465, 58 Atl. 492; State use of Barnet v. Dalton, 69 Miss. 611, 10 So. 578; State v. Kluseman, 53 Minn. 541, 55 N. W. 741; State ex rel. Pepple v. Banik, 21 N. D. 417, 131 N. W. 262; People v. Troutman, 187 Cal. 313, 201 Pac. 928.

Under our laws "neither a departure from the form or mode prescribed in 'the Code of Criminal Procedure' in respect to any pleadings or proceedings, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant or tended to his prejudice, in respect to a substantial right." Comp. Laws 1913, § 11,088. And "after hearing the appeal, the (supreme) court must give judgment without regard to technical errors or defects or exceptions which do not affect the substantial rights of the parties." Comp. Laws 1913, § 11,013. The record before us does not show prejudice to any substantial right of the defendant, even though it be true, as he claims, that the trial court erroneously sustained peremptory challenges on the part of the state to two jurors.

■ At the close of the state's case and again at the close of the entire case, defendant's counsel moved for an advised verdict of not guilty. The motions were denied and error is assigned upon such rulings. A careful consideration of all the evidence leads us to the conclusion that the trial court was correct in denying the motions for an advised verdict of not guilty. The undisputed evidence in the case is to the effect that the defendant was a director and the treasurer of the First Savings Bank of Grand Forks, North Dakota, and that one

Thomas Kady, who was engaged in the business of selling pianos, brought certain promissory notes, which he had received in payment of pianos, to the said First Savings Bank and there had certain negotiations with the defendant resulting in a sale of the notes at certain discount. There were a number of transactions; but in the main they were similar. One of these transactions occurred on or about February 15th, 1923. In this transaction Thomas Kady brought in four notes aggregating in all $7,643.56 and the defendant purchased them under an arrangement whereby Kady was to receive $5,643.55 and there was deducted, as a discount, $2,000. The undisputed evidence shows that the notes so discounted by Kady were at once placed among the assets of the bank and entered upon its loan register for the full face amount thereof. There was credited to Kady's checking account in the bank the sum of $5,643.55. The deposit slip for this deposit showed a deduction of $2,000 which the defendant Kady testified was the discount he paid and that he received no part of such money. It appears from the books of the bank that the $2,000 discount was disposed of in this manner: two notes aggregating $600 were taken out of the assets of the bank, and three certificates of deposit, two for $500 each, and one for $400, payable to Thomas Kady, six months after date, were issued and signed by the defendant O'Connor as treasurer of the bank.

The defendant testified that the two notes taken out of the assets of the bank were notes that had been purchased from Kady in a prior transaction and that they were returned to Kady.

Thomas Kady testified that he did not know the certificates had been issued; that they were never delivered to him and that he never endorsed or cashed them. The defendant admitted that he issued the certificates of deposit, also, that he endorsed Tom Kady's name thereon. He further testified that these certificates represented the discount upon the notes from Thomas Kady; that he bought the notes and paid for them himself; that when he bought them he intended to sell them to the bank and that he subsequently did so; that he made the deals with Kady for himself and owned personally whatever profits were made on the deals; that he issued the certificates in the name of Kady and endorsed his name thereto so that there would be a complete record of the Kady transaction. The defendant further testified that the certificates were marked paid and that the records show them to

be paid; but he denies that he received anything in payment; he claims that he merely surrendered the certificates for cancellation and that to balance the books of the bank he charged off certain bad cash items. The evidence does not show what became of these items.

The state introduced evidence tending to show that on a former trial the defendant had testified that he cashed the certificates and received the proceeds thereof. On the present trial, however, the defendant testified that when he gave such testimony he was under the impression that he was being asked about discounts and that he did not understand he was being asked regarding proceeds of the certificates of deposit; that he never did receive any money on such certificates but that they were merely surrendered for cancellation to take up certain bad cash items among the assets of the bank. Certain testimony was also given both by Kady and the defendant relative to a conversation between them had after the bank had been closed and a deputy examiner put in charge. Kady testified that at this time the defendant asked Kady to endorse the certificates of deposit and that in such conversation the defendant said to Kady:

"You know I bought these notes from you, and it came to the point where I was not able to handle them, and in order to get my profit out of these, I had to use your name, taking this money out of the bank."

"I tell you what I would like to have you do. They are all cashed and everything and I want your endorsement on the back of these, so that it will look like your name."

The defendant admitted that a conversation was had regarding the endorsement on the certificates of deposit; but he denies that the conversation was as detailed by Kady.

The deputy examiner, who was placed in charge of the bank after its closing, testified as an expert regarding the transactions,—basing his testimony upon the books of the bank. According to his testimony the certificates of deposit were paid out of the cash assets of the bank at or about the date they purported to have been paid. When the evidence is considered as a whole we are wholly agreed that it is sufficient to justify a submission to the jury of the ultimate questions of fact. In a word, we are agreed that upon the evidence it is clearly a question of fact for the jury to say whether the defendant fraudulently appro-

priated to his own use and to a use and purpose not in the due and lawful execution of his trust, certain moneys or funds of the bank.

■ It is next contended that the trial court erred in its instructions to the jury. In outlining to the jury the material elements of the indictment the court said that two of such elements were:

(3) "That the funds here complained of, whether in the form of certificates of deposit, cash, notes, drafts, bank checks, or bills of exchange, came into his possession as such officer, and that such funds belonged to and were the property of the First Savings Bank. . . .

(5) "That the defendant appropriated the money or C. D.'s, and spoken of as funds, fraudulently, and with the intent to deprive the bank thereof."

The court further instructed the jury as follows:

"Now before I pass on, may I also say to you, Members of the Jury, that the defendant is not on trial here for having proven to be a poor banker, if such has been the case, or for having taken in bad or poor paper. He is not on trial here either because the bank closed. Bear these things in mind. He is on trial here and is charged with, and named by the state, that he appropriated the discounts whether they were turned into the form of notes, or checks, or drafts, certificates of deposit, or cash, and which the state claims was rightfully the property of the bank. There is the rub of this whole lawsuit. There is the heart of this case. It is for you, Members of this Jury, to determine the facts relative thereto, and what the evidence has shown or not shown in connection therewith."

"Now, Members of the Jury, you have heard the transactions and which appears about in this form, that Mr. O'Connor, the defendant here, claims to have bought certain notes from Mr. Kady, known on the record here as certain piano notes, and that he discounted them, and that he thereafter turned the notes into the bank as assets of the bank, and gave Mr. Kady credit on the books of the bank therefor, and that he, Mr. O'Connor, kept and retained the discounts whether in the form of money, or whether he afterward put them into C. D.'s, or checks, or notes, or drafts, makes no difference, since it is simply a question of to whom did the proceeds of that discount belong."

The contention of the appellant is that these instructions must, or at least might, have led the jury to believe that if the discount on the

Kady notes actually belonged to the bank the defendant having issued the certificates of deposit, was guilty of embezzlement under the indictment, even though none of the certificates were in fact ever cashed, and though no part of the assets of the bank was actually appropriated. A careful consideration of the instructions challenged, and the charge as a whole, leads us to the conclusion that this contention is well founded. The charge construed as a whole made it permissive for the jury to find the defendant guilty of embezzlement, if they found that in purchasing the notes from Kady he acted for the bank so that the discount taken on the transaction belonged to the bank, even though the certificates of deposit issued for such discount were never negotiated or cashed and no part of the assets of the bank in fact ever appropriated. In short, the charge construed as a whole is susceptible of the interpretation that the act of issuing the certificates of deposit constituted embezzlement even though such act did not result in the appropriation of any of the "money, bank notes, or funds" of the bank. This was an erroneous statement of the law. Under our statute (§ 9931, supra) to constitute embezzlement there must be either a fraudulent appropriation of money or other property by the accused or a fraudulent secretion of such money or property with intent to so appropriate it. 20 C. J. 425, 426. "The fraudulent appropriation of property or the secretion of it with fraudulent intent to appropriate it, as described in the statute, are different acts or facts that constitute the crime of embezzlement, and are not means of committing that offense." State v. Lonne, 15 N. D. 275, 107 N. W. 524. The indictment in this case contains no charge of a fraudulent secretion with intent to appropriate the property of the bank. It charges a fraudulent appropriation only, that is, it charges that the crime of embezzlement was committed by fraudulent appropriation by the defendant of certain "money, bank notes and other funds" of the bank. Hence, fraudulent appropriation is an essential ingredient of the offense charged in the information. If there was no appropriation of any property of the bank there was no embezzlement as charged. There is no claim that the defendant embezzled the funds of the bank by converting such funds to his own use in purchasing the notes from Kady for himself. On the contrary the claim is that the defendant purchased these notes in the due course of business as an officer of and for the bank and that consequently the

discount or profits on the transaction belonged to the bank and that the defendant fraudulently appropriated moneys or funds of the bank equivalent to the discounts or profits realized on such deal. To prove such appropriation by the defendant the state adduced evidence tending to show the transactions between the defendant and Kady in which the discounts were taken; that certificates of deposit were issued for the discounts and that such certificates were subsequently cashed and as a result moneys, bank notes or funds of the bank, equivalent to the discounts taken and the certificates of deposit issued, appropriated by the defendant to his own use. But as said the court's instructions permitted the jury to find the defendant guilty of embezzlement even though he did not negotiate or cash the certificates. It permitted the jury to find him guilty if they found that the discounts for which the certificates of deposit were issued belonged to the bank. It made the issuance of the certificates of deposit tantamount to an appropriation of moneys, bank notes or funds of the bank. But the mere issuance of a certificate of deposit does not appropriate any property of the bank. The issuance of such certificate, if valid, is in legal effect, the giving of a promissory note by the bank and creates the relation of debtor and creditor between the bank and the payee or holder of the certificate. 7 C. J. p. 647; 3 R. C. L. p. 572; 1 Morse, Banks & Bkg. 6th ed. pp. 698, 699; 2 Michie, Banks & Bkg. p. 1264. The certificates of deposit were issued to Kady, but were not delivered to or negotiated by him. They created no liability against the bank and there was no fraudulent appropriation of any of the bank's assets until the certificates were cashed and some part of the assets of the bank taken out.

Error is also assigned upon the following instructions:

"Now, Members of the Jury, the defendant claims he was carrying on a private discounting business; that he was engaged in a personal business in which he discounted paper, and that the discounts derived from such business rightly belonged to him. That is his defense."

"Now a person has a right to engage in a personal discounting business, but when he engages in a personal discounting business in rivalry of or in competition with a bank of which he is an officer, and in actual charge and management of its business, then the law charges him with the duty of acting openly and aboveboard, honestly, and in good faith. This is not only good law but good morals."

"If you find from all the evidence in this case that the discount belonged to the defendant, and that he dealt openly and aboveboard and in good faith with the bank, then he is not guilty and it would be your duty to return a verdict of not guilty."

The first of these instructions, in effect, informed the jury that defendant's defense was that the discounts derived from the transactions had with Kady belonged to the defendant personally. This, however, was not defendant's only defense. His other defenses were: (1) That he was authorized by the board of directors of the bank to take, receive and keep such discounts for himself; and (2) that the so-called discounts upon the Kady notes were in fact never appropriated by the defendant but were used by him for the benefit of the bank and that he never received any part of such discounts.

As we read the record there was no evidence tending to show that the defendant had authority to take and keep the discounts upon the Kady notes, provided such discounts belonged to the bank; but there was evidence of sufficient probative character to require submission to the jury of the questions: (1) Whether the defendant in the transactions with Kady acted for himself, and not for the bank, so that the discounts in fact belonged to the defendant individually; and (2) whether the defendant actually reecived the discounts and appropriated any part thereof to his own use; that is, whether it is true as defendant claims that he never negotiated or cashed the certificates of deposit but retained them in his possession at all times after issuance and eventually surrendered them to the bank for cancellation so as to enable the bank to take out of its assets certain worthless cash items,— the bank thereby receiving in full the discounts evidenced by the certificate of deposit. The first of the three instructions last quoted clearly had a tendency to more fully impress upon the minds of the jury the view expressed in the instructions first quoted in this opinion and lead them to believe that the defendant would be guilty of embezzlement merely by issuing the certificates of deposit even though he never negotiated or cashed them; but surrendered them for cancellation and consequently never in fact appropriated any part of the assets of the bank.

We are also of the opinion that the two instructions last above quoted were erroneous. The jury might well have interpreted these

instructions as meaning that even though they found that the discount taken on the Kady notes actually belonged to 'the defendant, he would still be guilty of embezzlement if he did not deal openly and above-board with the bank in the transaction. Defendant's method of dealing was a legitimate matter to consider in determining the nature of the transaction, that is, in determining whether the transaction was his own or a transaction of the bank which he sought to conceal from those interested. But his motive is not an ingredient of the offense. 20 C. J. 436. A person who openly and brazenly fraudulently appropriates property entrusted to him is as much guilty of embezzlement as one who does it by stealth or concealment. The ultimate question at issue was whether the defendant had fraudulently appropriated to his use, not in the due and lawful execution of his trust, any property which he had in his possession or under his control in virtue of his trust. Sec. 9931, supra. If he did then he is guilty of embezzlement as charged in the indictment regardless of whether he did it openly or in secret. If he did not, then he is not guilty of such embezzlement without regard to whether he did or did not commit acts that otherwise might subject him to legal proceedings under other provisions of law, or to censure for having acted contrary to good morals.

The paramount, and indeed the only, question involved in a criminal case is whether the defendant is guilty of the crime charged. It is a fundamental principle of our law that every person charged with crime is entitled to a fair trial. Procedural statutes are enacted for the purpose of affording this; and under our laws it is provided that any departure from the procedure prescribed and any error or mistake therein shall not affect the verdict rendered unless such departure, error or mistake has actually prejudiced the defendant, or tended to his prejudice in respect to a substantial right. Comp. Laws 1913, § 11,088. The errors in the instructions in this case unquestionably prejudiced the defendant, or tended to his prejudice, in respect to a substantial right. The jury, in giving heed to these instructions, might well have returned a verdict against the defendant although they were of the belief that he had not, in fact, appropriated any of the assets of the bank. It is the duty of this court to render judgment according to the law of the land; and inasmuch as the defendant was denied

that fair trial to which the laws of this commonwealth entitle him, the judgment appealed from must be set aside and a new trial had. It is so ordered.

BURKE, Ch. J., and BIRDZELL, NUESSLE, and BURR, JJ., concur.