[File No. Cr. 222]

STATE OF NORTH DAKOTA, Respondent, v. AUGUST L. PUSCH, Appellant.

(46 NW2d 508)

Opinion filed December 30, 1950.   Rehearing denied March 14, 1951

*Johnson & Miloy*, for appellant.   (*Dell, Rosengren & Hufer* and *Bradford & Kennedy* of Counsel).

*Wallace E. Warner,* Attorney General, and *Vernon P. Forbes,* State's Attorney, for respondent.

CHRISTIANSON, J. The defendant, August L. Pusch, and Lydia Witt were informed against by the State's Attorney of Richland County, and by such information they were accused of the murder of one Minnie Pusch in said county on the 26th day of September, 1947. The information was dated November 3, 1948, and was presented and ordered filed in the office of the Clerk of the District Court of Richland County on that same day. The information alleged:

"VERNON D. FORBES, State's Attorney within and for the County of Richland and State of North Dakota, accuses the above named defendants, August L. Pusch and Lydia Witt, with the crime of murder in the first degree, committed as follows, to-wit:

"That, on and about the 26th day of September, 1947, in the County of Richland and State of North Dakota, the above named defendants, August L. Pusch and Lydia Witt, did, wilfully, un-

lawfully and feloniously, and with a premeditated design to effect the death of one Minnie Pusch, a living human being, administer, and cause to be administered, to the said Minnie Pusch, a deadly poison, to-wit: strychnine, from which the said Minnie Pusch then and there died."

Lydia Witt moved for a separate trial which motion was granted. Thereafter the defendant Pusch moved for a change of place of trial pursuant to the provisions of NDRC 1943, Sec 29–1501. The motion was denied. The defendant Pusch entered a plea of not guilty and the action was brought on for trial before a jury with the Honorable Wm. H. Hutchinson as presiding judge. The jury returned a verdict finding the defendant Pusch guilty of murder in the first degree and fixing as his punishment imprisonment in the State's penitentiary for life. The defendant moved for a new trial which was denied and the defendant has appealed from the judgment of conviction and from the order denying the motion for a new trial.

The trial was quite extended. The transcript of the evidence adduced and the proceedings had upon the trial aggregates more than 900 pages. There are also a large number of exhibits including certain letters or notes some written by the defendant and others written by Lydia Witt. The defendant Pusch, Lydia Witt, and her husband Otto Witt were all sworn and testified as witnesses upon the trial. According to the evidence Minnie Pusch at the time of her death was approximately 60 years of age and the defendant, August L. Pusch, was approximately 60 years of age. The defendant and Minnie Pusch were married in October 1909 and lived together as husband and wife from the time of their marriage until the death of Minnie Pusch. According to the testimony of the defendant, he and his wife, Minnie Pusch, never had sexual relations. The defendant Pusch and his wife, Minnie, moved to Wahpeton in 1943 where the defendant was employed as manager of a local grain elevator owned and operated by the Peavey Elevator Company. He continued in such employment until January 1948. The elevator company owned a residence in the vicinity of the elevator which they furnished to the manager and which was occupied by the defendant

and his wife during the time they lived in Wahpeton until the death of Minnie Pusch.

Lydia Witt, named in the information as co-defendant of August L. Pusch, is the wife of one Otto Witt. Otto Witt and his wife were married in 1923. They lived on a farm in the vicinity of Wahpeton and when they moved to Wahpeton in 1942 or 1943 they had four children. Otto Witt had been a farmer all his life until he was employed by the defendant Pusch to work in the elevator then managed by him. After such employment the Witt family moved to Wahpeton and occupied a home located about a half block from the home occupied by the defendant Pusch and his wife. There is some discrepancy in the testimony as to when Witt moved to Wahpeton. Witt testified that it was in 1942. The defendant Pusch states that it was in 1943. The deceased, Minnie Pusch, worked at the elevator as a bookkeeper for a period of approximately two years after Witt was employed there and during that time Mrs. Witt took care of some of the Pusch household duties and the two families were on friendly terms. However, the evidence shows without dispute that relations between the defendant, August L. Pusch, and Lydia Witt later became intimate and that illicit sex relations between the two commenced in 1943 or 1944 and continued until they were arrested in May 1948. There is a discrepancy in the testimony as to when the illicit sex relations began. Lydia Witt fixes the time as in May 1943 and the defendant, August L. Pusch, fixes the time as in the fall of 1944. They agree, however, that such relationship existed and that after it commenced it continued from time to time and from place to place including the home of Lydia Witt in Wahpeton until the arrest of the defendant Pusch and Lydia Witt in Arizona in May 1948, where they were then living together and holding themselves out to be husband and wife. In November 1945 Lydia Witt gave birth to a female child who was named Barbara. She testified that the defendant Pusch was the father of this child. The defendant testified that in March 1945 Mrs. Witt told him she was pregnant, and that he then told his wife that he had been having sex relations with Mrs. Witt, and that she had become pregnant. He

further testified that when the child was born he told his wife about the birth and that he was the father of the child. The evidence shows that Minnie Pusch had been ailing and in 1947 had been in a hospital in the neighboring City of Breckenridge. When she returned to her home from the hospital on August 4, 1947, the defendant Pusch employed one Mrs. Amundson, an elderly woman, to come and live at their home, take care of the housework and attend to Minnie Pusch. Mrs. Amundson worked there until after Mrs. Pusch died. She was present at the time of Mrs. Pusch's death. She testified that on the evening of September 25, 1947, Mrs. Pusch became very ill; that she had convulsions requiring that she be held so as not to fall out of bed; that the convulsions did not start until after 7 o'clock after the defendant Pusch came home that evening; that Otto Witt was called over to help care for Mrs. Pusch; and that Dr. Thompson was also called. She testified that she went to a nearby store and that Otto Witt had arrived while she was out; that as she came in the door she observed Pusch giving his wife some medicine and that he said, "take these and relax." She testified that she had never given Mrs. Pusch any of the so-called vitamin pills; that she had given her the nerve pill and sleeping pill; that she did not see the vitamin pills except when she saw them in a teaspoon when Pusch was giving them to his wife; that he kept the vitamin pills. The defendant Pusch testified that when he came home about six or after on the evening of September 25, 1947, he went into the bedroom and that his wife said, "August I am dreadfully sick, getting a spell, call Otto and the doctor right away;" that he called Witt and called the doctor but was unable to get him; that he asked his wife if she had had supper, that she answered she "couldn't stand to look at food;" and that he said, "don't you think you ought to try to eat one or two mouthfuls of food;" that the doctor had told him to insist on food as much as possible because of the amount of aspirin she was taking each day; that she answered she could not eat but would take her medicine; that about this time Witt came in and that he (Pusch) does not know how much he heard but that Witt saw him give her the medicine. Pusch testified that on the

evening of September 25, 1947, he gave his wife two pills in the presence of Mr. Witt, and that one of these was one of the so-called vitamin pills. Witt testified that the defendant Pusch called him about 7 o'clock in the evening of September 25, 1947, and asked him to come over saying that Mrs. Pusch was quite sick. He testified that when he arrived he found that Mrs. Pusch was in bed having a shaking spell; that Mrs. Amundson was holding her by the hips, that Pusch held her by the shoulders, and that he, Witt, held the knees down; that they were afraid she would fall out of bed if they did not hold her; that this continued for some time; that Pusch then said, "This can't go on all night;" that he said to his wife, "You take these sleeping pills and lay down and relax and go to sleep;" that he took what Witt denominated sleeping pills out of a bottle in the corner, that she (Mrs. Pusch) said, "I don't want any pills," that he said, "Take these pills, go to sleep, I have got to go to work tomorrow," that he gave her the pills, and then he got the bottle and gave her another one and took another one and gave her water afterwards; that after he gave her the pills "she got terrible" and that they called the doctor. Dr. Thompson testified that Mrs. Pusch first became his patient in September 1946; that at that time he had her hospitalized; that from that time on he continued to see her and prescribed medicine for her treatment. He testified that among other medicines he prescribed vitamin B complex capsules and that these were given during 1947. He testified that he was called to the Pusch home on the evening of September 25, 1947, that he found Mrs. Pusch in severe convulsions, that he had observed convulsions on four or five prior occasions during August and September 1947; that on the evening of September 25th he gave her a hypo of a sixth grain of morphine and about fifteen or twenty minutes later gave her a twelfth grain; that they did not seem to have any effect. According to other testimony the doctor arrived about 10 or 10:30; that he gave her two hypos for the purpose of quieting her; that the first did not have much effect, that a few minutes later he gave her another which seemed to quiet her somewhat. Minnie Pusch died between 1 A.M. and 2 A.M. September 26,

1947; the doctor, according to his testimony, believed that the cause of death was brain tumor, although in the death certificate he listed the cause of death as myocarditis. The body of Mrs. Pusch was taken to Mitchell, South Dakota, for burial where the Puschs had purchased a lot in the cemetery some years before. The body was accompanied by Pusch, and by Witt and Mrs. Witt, and Mrs. Amundson. The burial took place September 30, 1947. Later Witt sold his house and in November 1947 at the suggestion of the defendant Pusch the Witt family moved into the house that Pusch and his wife Minnie had been occupying and which he then was occupying and that he and the Witts continued to live there until February 1948. The evidence shows that about December 14, 1947, the defendant Pusch and Lydia Witt and three children of the Witts drove to California and returned by way of Meza, Arizona, where they visited certain relatives. They returned to Wahpeton, arriving there the first part of January 1948, and on February 7, 1948, they again left for the west. They went to defendant's brother at Meza, Arizona, where the defendant bought a small ranch. The defendant, Mrs. Witt and the children lived there and she was known as Mrs. Pusch and signed checks in that name. They continued to so live together until in May 1948 when they were arrested and brought back to Wahpeton and charged with the murder of Minnie Pusch.

From facts which had come to the knowledge of the State's Attorney of Richland County he determined that the body of Minnie Pusch ought to be exhumed and an autopsy conducted to ascertain the cause of her death. Accordingly he made application to the coroner of Davidson County, South Dakota, where the body of Minnie Pusch had been buried in September 1947 and on May 10, 1948, the body was exhumed and an inquest held. A post mortem was made by Dr. Saiki of the University of North Dakota, a pathologist and physician, and by Dr. Moran, pathologist of the University of South Dakota. The two conducted the post mortem together. They examined the brain and other vital organs to ascertain the cause of death. According to their testimony given upon the trial of this case they found no

evidence of disease or cause of death from such examination; they found no evidence of a brain tumor or of heart disease or any other indication of cause of death. They removed from the body the entire stomach with its contents and portions of vital organs of the body such as the brain, liver and kidneys. These were placed in jars which were sealed. The stomach was taken by Dr. Saiki together with other parts of vital organs. Parts of the same organs were put in jars and sealed and taken by Dr. Moran, pathologist of the University of South Dakota. Dr. Saiki took the parts of the body which had been removed and placed in his care and turned them over to Dr. Abbott, Professor of Chemistry at the University of North Dakota, and a well known chemical toxicologist. Dr. Moran took the jars containing the portions of the vital organs which had been turned over to him and in turn delivered them to Dr. Frary of the University of South Dakota, State Chemist of South Dakota. Both Dr. Saiki and Dr. Moran testified in detail as to the post-mortem examination, as to the examination made of the vital organs and of the body and of the portions of the body they removed and that were later analyzed by Dr. Abbott and Dr. Frary. Both Dr. Saiki and Dr. Moran testified that they found nothing upon such post-mortem examination indicating the cause of death of Minnie Pusch. Each of them testified that based on what he observed at the time they performed the post mortem and the examination then made and upon the findings of the chemists, who later analyzed the parts of the body which Dr. Saiki and Dr. Moran removed, as given in the testimony of Dr. Abbott and Dr. Frary upon the trial and in their presence, it was his opinion that the death resulted from strychnine poisoning. In his testimony Dr. Moran summarized and computed the amount of strychnine that had been found by the chemists and basing his opinion on such facts, expressed it as his opinion that Minnie Pusch died from strychnine poisoning and that this was the cause of death. Dr. Saiki testified that basing his opinion on the amount of strychnine recovered by the chemists and their findings as to the presence of strychnine in the several organs of the body and upon the autopsy findings Minnie Pusch died from strychnine poisoning

and as a result of a dose or doses of strychnine sufficient to cause her death. On cross-examination Dr. Saiki stated that strychnine causes death within a comparatively short time after it is taken, that it may be a matter of hours or it may be less. Dr. Abbott testified that the only conclusion he could draw from the distribution of strychnine throughout the body and the various vital organs was that the strychnine came into the body through the stomach, passed through the stomach by absorption into the blood and was carried by the blood to the organs where they found it. He testified also that from the distribution of strychnine in the various organs he was satisfied it was introduced through the stomach and that at the time it was introduced the patient was living and the blood was circulating in order to produce the condition he found. He further testified that in his opinion the strychnine that he recovered had been absorbed by the vital organs before death and that the strychnine had been administered and had come into the stomach at the same or practically the same time either as a single dose or in doses received within a brief period of time. He further testified that there was sufficient strychnine in the organs and body of Minnie Pusch to constitute a lethal dose for an adult person. Dr. Frary testified that from his examination and chemical analysis of the body and particularly the vital organs of Minnie Pusch he was of the opinion that there was enough strychnine in her body to have caused death and that the organs contained sufficient strychnine to cause the death of an adult person.

Lydia Witt testified that on July 1, 1947, she purchased a bottle of strychnine at the request of the defendant which she delivered to him. The record shows without dispute that she did purchase strychnine at a drug store at Breckenridge, Minnesota, on July 1, 1947, and that she signed the register kept by the druggist of the purchasers of strychnine. She stated that she turned the bottle of strychnine over to the defendant Pusch and that he paid her thirty-five cents, the amount she had paid for it. She testified that he asked her if she signed her own name on the register of the drug store where she made the purchase, that she answered, "Yes" and he said, "How dumb!"

and further stated if he purchased strychnine he "wouldn't shave for two or three days and wear dirty overalls" before making the purchase. She testified that in the first part of January 1947 Pusch came to her house one morning and said that when his wife went to the hospital he had filled some of the capsules containing vitamin preparation which the doctor had prescribed for his wife with strychnine and that she must have gotten one of those in her medicine when she went to the hospital and was taken sick. She further testified that some two weeks later he came over to the house in the afternoon and put a bottle labeled strychnine on the table, took a razor blade and two of the so-called vitamin capsules out of his pocket and laid them on the table, and that he went to the bathroom and got some tissue paper and laid that on the table, took the razor blade and shaved the vitamin capsule end to end so that he could squeeze the contents out with a knife and that he filled the capsule with whatever was in the bottle labeled strychnine and that he then packed the capsule and said, "It's got to be round like the rest." That when they were filled he pasted the capsules shut and put them in a little strip of paper and put them in his pocket; that this was all done in her home in Wahpeton, that he took out most of the vitamin filling in the capsule and told her to get a toothpick, that she took a toothpick to pick out the insides, then he said, "It's got to be all taken out" and further said, "Now you fill this one," and that she took the bottle and filled the capsules, that he said, "they have got to be tamped full," and that was one of the two she handed back to him. That she then asked, "Are you going to give this to her?" and that he answered, "Not unless she gets ornery." She further testified that in the fall he made some more pills, that he came to her home and took out of a paper sack a bottle labeled strychnine and put it on the table and that he had a little bar of iron about two and one-half inches or three inches long and not quite an inch thick which had a hole bored through it at one end. That he laid this on the table, put some water in a glass and put that on the table, threw back the table cloth and put the iron down, that he took out some "white stuff" that he called plaster of paris and put that in the hole, that then

he took the bottle labeled strychnine put in some of its contents, and then took his pocket knife and dribbled water out of the glass on the stuff he put in the hole. He said the hole was the thickness of the pill, that after he had the water in there he stirred it and that it hardened. When it had hardened a little bit he put a groove in the center, and let it harden a little more, that he then hit on the iron with a knife and the pill fell out and he said, "You can't tell the difference between these and the real ones." That when three or four were made he put them in his pocket and put the rest of the things away. That this took place sometime early in August 1947. That on the morning after Mrs. Pusch died, namely, on the morning of September 26, 1947, he came to the house between 8 and 9 o'clock in the morning and told her that some of the relatives came last night and that he handed Mrs. Witt a newspaper with something wrapped in it and said "put it in the basement"; that she took it and that he gave her some pills and said, "throw these away" and went away. That afterwards she went out in the garden and took the pills with her and when she got there she looked at them, that they had a groove in them, that she saw a crack in the ground and laid them there and marked where they were so she could find them and covered them up with some dirt and put some carrot greens on top. That after she was incarcerated in the jail in Wahpeton she told the State's Attorney about the pills and that later she accompanied the sheriff of the county and his deputy to the place where she had buried the pills, that they dug and removed what had been placed there. The sheriff and his deputy testified that they did accompany Mrs. Witt to the place in the garden which she pointed out to them that they dug and found some "white stuff" and also one of the pills described by her. That these were sent to Professor Abbott, the State Chemist. Mrs. Witt further testified that shortly before they went to Meza, Arizona, Pusch told her he had killed his wife. She testified that he further said that he had destroyed everything "the next morning" and that "they cannot prove and say that I did it unless you tell them"; that he further said that "no one could

prove it unless I told because he told me about those pills before he was going to give them."

The defendant Pusch contradicted the testimony of Mrs. Witt, and denied that he ever said to her that he killed his wife, or that Mrs. Witt ever helped him remove the contents from vitamin capsules and put strychnine into such capsules. The defendant Pusch also testified that he worked for the Peavey Elevator Company about five years in all. That to begin with he received a salary of $125 per month, which was later increased to $160 per month and that the last two years he received $175 per month. He further testified that he and his wife as joint tenants owned a house in Mitchell, South Dakota; that they sold this property and on August 5, 1947, executed and delivered a deed for it to the purchaser and that he received in all $8400 for the house but that $400 was expended as a commission leaving $8000 net. That he bought U. S. Savings Bonds Series G for the $8000. That such bonds were made payable to him and to his wife jointly and that under the terms of the bonds he became the sole owner upon the death of his wife. Defendant Pusch testified that he cashed the U. S. Savings Bonds Series G and used the proceeds thereof in the purchase of the ranch in Arizona. The defendant testified and the evidence shows without dispute that under the provisions of the will executed by Minnie Pusch her then husband, the defendant, was made sole beneficiary. The evidence further shows that Minnie Pusch owned a farm in Otter Tail County, Minnesota, which according to the inventory had a value of $6500. The will was admitted to probate upon the petition of the defendant. The defendant was also the beneficiary in a life insurance policy for $1000 upon the life of Minnie Pusch.

After the defendant Pusch and Lydia Witt were arrested in May 1948 and brought back to Wahpeton they were incarcerated in the county jail and remained there until the trial of this action. The record shows that a preliminary examination was had on July 9, 1948, upon the complaint in which the defendant Pusch and Lydia Witt were charged with murder in the first degree. According to the record of the preliminary examination

both the defendant Pusch and Lydia Witt were present with their attorneys at such preliminary examination but neither of them testified. On that same day the defendant Pusch had one Dr. Beithon, a physician practicing in the City of Wahpeton, called to attend him. Dr. Beithon testified that he had been called to attend the defendant Pusch on June 8, 1948, and that he, Beithon, again called to attend him pursuant to call on July 9, 1948. He testified, "He requested that I go up to see Mrs. Witt because she had been ill." "He requested me to go and see Mrs. Witt and asked me to take up a prayer book, which he showed me. It was a prayer for each day of the year. And asked me to take it up to her just as I was leaving the cell." Dr. Beithon testified that he examined the book and found that it contained a message from the defendant Pusch to Mrs. Witt and that he delivered the book and the message to the sheriff. He observed certain notations made with lead pencil inside the first cover, one reading, "Read July 10th." When he turned to this page he noticed the page was missing and that in the space where the page had been, a letter written by Pusch to Lydia Witt had been inserted. The letter which was found in the book read in part as follows:

"Honey Darling: You looked worried today, please take it calm, like Kennedy said it begins to look better for us all the time. I told him to try and get you out, and he said I think we can get you both out. Forbes of course was mad he lost the main strike, wen Kennedy got that old Gentleman to say that he could not say that she died of that, he said maybe somebody shot here.

"Kennedy said don't talk to anybody only your preacher and not to much to him.

"I called for Dr. Beithon I am going to tell him about your piles I want him to give you something for them, and then I am going to tell him about the other. So please do not worry remember God is still with us and all ways will be Elmer done a little harm but not to much, we can forgive him however he should have never come there it would have been better. Now honey I don't know how I am going to get this to you but those darn 2 sheriffs can they lie well there time is coming. Now chin up and don't worry they told me not to talk to you anymore than

a good morning I wanted to say more but they had someone watching all the time I was glad you got to talk to Elmer and some to that other woman. That kind of helped you a little. . . . Now Lydia please not in the dumps it is never so bad but what it could be worst and remember God wants us to trust him he had his ways and his ways are best. . . . I am not worried and don't want you to be. The Doctor is coming after supper. I am going to try and have him take this up to you. So nighty night

As ever   August"

(The record of the proceedings had at the preliminary examination shows that Kennedy was one of the attorneys for the defendant who participated in the preliminary examination and cross-examined witnesses called by the State. It also appears from the record that Elmer Witt, the son of Mrs. Witt, was called by the State and testified as a witness upon the preliminary examination.) On cross-examination Pusch testified that he wrote the letter and placed it in the book and turned the book containing the letter over to Dr. Beithon and asked him to deliver it to Mrs. Witt.

Another letter was also introduced in evidence as part of the defendant's cross-examination. The letter contains no date but it was written and sought to be delivered while they were both incarcerated in the county jail. This letter read in part as follows:

"Dear Lydia:

"Please calm yourself what is the trouble you know that our attorneys are trying to get us both out, and I think you are as good as out now.

"You know I also walk the floor day and night and think of the two little girls, but there is nothing we can do until we get out. So chin up honey. . . . Now Darling are you with me or against me please tell our attorneys, where you stand. You know that we are not guilty and I am not going to plead guilty, if I have to go down, I will go down standing up, you know I never showed you any pills and you heard the man in the court

house say it would have killed her within an ½ hour and the pills I gave her I took out of the bottle from the dresser and Otto saw me. . . . If we both get out we both better go to Arizona with Tom and Minnie and get our things sold that are still out there, if I can't get out, then you better go with them and look after all of it, take Barbara with you and Jeanne will be going to school, I want you folks to try and sell the ranch while you are out there and you may be gone for sometime, that's why I said take Barbara with you.

"Now sweetheart remember that together we can lick this lawsuit alone we will be lost, so please think it over, as I would like to know, . . . .

"Now honey let me know by our lawyer just what your plans are. Did you get Minnie's letter she wrote you?

Lots of love as ever your only<br>August

"The windshield wipers say together, together, write a note please".

The defendant on his cross-examination admitted that he wrote this letter and that he caused it to be sent to Mrs. Witt but that he does not remember to whom he handed the letter for delivery to Mrs. Witt. Lydia Witt testified that she received the letter from a certain person whom she named to whom the defendant had delivered the letter for delivery to her.

The defendant called as witnesses, among others, Dr. McCartney, Associate Professor of Pathology of the University of Minnesota, and Dr. Pierce of Wadena, Minnesota. Dr. McCartney testified that at the request of defendant's attorney he went to Mitchell, South Dakota, on October 30, 1948, for the purpose of performing, and did perform, a post mortem on the body of Minnie Pusch. He testified that he removed from the body certain parts including portions of the vital organs which had been left when the first post mortem was made. He testified that the pituitary gland was still in its normal position, that he removed it and found it was approximately two-thirds of its normal size, that the anterior lobe was replaced by a thin walled cyst. He testified that he placed the parts of the body which he removed in jars

which were closed with sealing wax and that each jar was labeled as to its contents and those labels signed by the coroner and that the jars were then sent to Dr. Kozelka, toxicologist of the University of Wisconsin. Dr. McCartney testified further that the report received from Dr. Kozelka disclosed the presence of strychnine in the parts of the body which he examined and analyzed. He further testified that the cyst in the pituitary gland indicated Minnie Pusch probably had Simmons disease, which, in his opinion, accounted for the long and lingering illness which she had suffered. He expressed no opinion as to the cause of death. Dr. Pierce testified that he is a practicing physician and surgeon having been licensed in Minnesota in 1914 and having practiced in Minnesota since that time where he has been associated with the Wadena Clinic, and that the last few years he has been devoting his time entirely to X-ray and surgery work. He stated that he is not a chemical toxicologist. He testified that basing his opinion on the statement of facts in a hypothetical question and upon the testimony of the defendant Pusch given in his presence as to the condition of Minnie Pusch during her lingering illness and further upon the report or testimony of Dr. McCartney as to the cyst in the pituitary gland that in his opinion Minnie Pusch was suffering from Simmons disease in an advanced stage. He further testified that Simmons disease at an advanced stage can be fatal.

The first assignment of error is predicated upon the denial of defendant's motion for a change of venue from Richland County. NDRC 1943, 29–1501. The grounds alleged were that the people of the county were so prejudiced against the defendant and the offense of which he is accused that he could not have a fair and impartial trial; that it was impossible to obtain a jury in the county that had not formed an opinion as to the guilt or innocence of the defendant such as would disqualify its members as jurors and that public sentiment had been created and aroused against the defendant by newspaper articles and comments with respect to the crime, which newspapers have been circulated generally throughout the entire county and had created general discussion in every community and resulted in

prejudice against the defendant. The motion was supported by the affidavit of the appellant and by affidavits of two of his counsel. Attached to the affidavit of one of counsel is a copy of the Chicago Tribune containing an article relating to the alleged crime. There was also submitted the affidavit of the publisher of the newspaper published in Wahpeton as to the extent of the circulation of such paper throughout the county which showed a wide circulation. There was also submitted in support of the motion fourteen additional affidavits signed by residents of the various parts of the county. In opposition to the motion there were filed by the State thirty affidavits signed by citizens and residents in the various parts of the county including the sheriff of the county. The motion came regularly on to be heard in the District Court of Richland County. Both defendants were present with their counsel and the counsel for the State was present. The trial court called for oral examination four of the persons who had signed the affidavits in support of the motion for a change of venue and gave to each of these persons an opportunity to fully express their views with respect to the general statements made in their respective affidavits. Counsel for the State propounded no questions to any of the persons so examined but counsel for the defendant propounded a number of questions and the trial judge personally propounded a number of questions all bearing upon the matters contained in the respective affidavits and seeking to ascertain the basis for the general statements in the affidavits as to the alleged prejudice of the people of the county against the defendant or the crime of which he is accused, and whether the accused could or could not have a fair and impartial trial in the county. One of the persons so called was a former sheriff and a then police officer in the county, another was a person who was then serving and for a number of years had served, as mayor of one of the larger cities in the county other than Wahpeton. While they expressed the belief that there was prejudice against the defendant they stated that they had heard of no threat or purpose to harm the defendant. Taken as a whole the affidavits do not differ largely from affidavits which are gen-

erally submitted on applications of this nature. The counter affidavits were also from persons from different localities in the county who because of the period of their residence, and the occupation or vocation in which they were engaged, would have had an opportunity to come in contact with the people generally and observe public opinion. The affidavits filed in opposition to the motion denied the existence of the prejudice alleged against the defendant and expressed the opinion and belief of the respective affiants that there was no prejudice against the defendant personally and that a jury could be obtained which would give the defendant a fair trial and decide the case according to the evidence and not otherwise.

It naturally follows that when crime has been committed involving the taking of human life the newspapers generally carry accounts containing reference to proceedings that may have been had in the investigation or discovery of the crime and that such statements naturally create discussion in the communities reached by such newspapers, but the fact that a person has read the newspaper accounts of the alleged crime does not ordinarily disqualify such person to serve as a juror. That has been specifically recognized by the legislature and by this court. NDRC 1943, 29–1738; State v. Gordon, 32 ND 40, 155 NW 62.

The question whether a change of venue should be had on the ground that the people of the county are so prejudiced against the defendant or the offense of which he is convicted that he cannot have a fair and impartial trial and that it is impossible to obtain a jury in the county that has not formed an opinion as to the guilt or innocence of the defendant such as would disqualify its members as jurors is a serious matter in every case in which it is presented. In the very nature of things the trial judge is in a better position to form a correct judgment as to the existence or nonexistence of the grounds for such motion than are the members of this court who have before them only the affidavits submitted for or against the motion. Consequently it is a rule that a motion for a change of venue is addressed to and invokes the sound judicial discretion of the trial

court. State v. Winchester, 19 ND 756, 122 NW 1111; State v. Gordon, 32 ND 31, 155 NW 59, Ann Cas 1918A, 442; State v. Bossart, 61 ND 708, 240 NW 606; State v. Bossart; State v. Ellingson, 62 ND 11, 241 NW 78; State v. Gugel, 65 ND 587, 260 NW 581; State v. Phillips, 68 ND 13, 277 NW 609. After the completion of the oral examination of the persons who had made affidavits in support of the motion the trial court asked whether there was anything further that the defendants wanted to present. Defendant's counsel suggested that he would like to be heard in the way of argument on the motion. Thereupon arguments were had and after the arguments had been concluded the trial court in announcing his ruling said in part:

"I have given very careful consideration to this matter of the motion for a change of venue and I reach the conclusion that the motion must be denied, and I want to just state a few of my reasons, for the record, for the denial of the motion.

"I have carefully read all of the newspaper accounts as presented by this motion. It is true that the papers, especially the local paper here, carried quite a little of the record as made by the State in its preliminary matters in this case. However, it is quite significant that the papers made no statement whatsoever as to any conclusions in the case. There is no statement in the papers that would tend in any way to excite the public or to try to influence the public against the defendants or any one else. There is no editorial comment whatsoever and no other statement in the paper—even in the expression of what they termed were the facts, they didn't present them as facts, they merely presented them as the record made by the State in these presentations. They made no comment whatsoever of whether they were the actual facts in the case or not. I can't find anything in the papers that would tend to inflame the minds of the public. And I do not believe that the record as presented here shows that the public has been inflamed in this county or the minds of the people have been at all inflamed. It is true that in a case of this kind, where the very nature of the case and the circumstances surrounding arouses a certain public interest, it is bound to have more or less discussion. But I think the law contemplates

that there must be an atmosphere such that the defendant can't have a fair and impartial trial in order to remove the case to another county. I don't find any such sentiment expressed here.

"There has been no evidence of any attempts, or even statements, with reference to violence of any kind. I don't find that there has been any evidence produced of any violent statements against the defendants, or any unfair or even discourteous statements with reference to the defendants. I don't believe that the feeling is such that it would have any tendency to intimidate or coerce a jury that was sworn to try this case and do their duty according to the evidence and the instructions of the court. I honestly believe that the defendants can in this county have a fair and impartial trial."

The record shows that in the selection of the jury neither the State nor the defendant exhausted the peremptory challenges allowed them by law. The defendant had seven peremptory challenges which had not been exercised. The record does not show that any objection was made to any juror that was selected on the ground of his prejudice or bias. We are agreed that on the record presented here no error was committed in the denial of the motion for a change of venue.

Error is also assigned upon the ruling of the court rejecting the evidence offered by the defendant to show the result of a lie detector test said to have been applied to the defendant at his request in a room at a hotel in the City of Wahpeton. Evidence was introduced to show that the State of North Dakota has purchased and owns a polygraph, commonly known as a lie detector, for use in investigation of crime by the Attorney General's office. The defendant called an Assistant Attorney General who testified that he had taken instruction in the operation of the polygraph or lie detector under one Leonard Keeler said to be the inventor of the machine, and that thereafter he had used the machine on approximately sixty occasions in less than two years. He produced a paper designated as a graph which he said was taken in the course of the test applied to the defendant. Defendant's counsel stated:

"We offer to show that the graph, that the numbers where the

questions were asked show perfectly normal reactions, and that there is nothing about this graph that in any way discloses any falsification, lying or untruthfulness on the part of the defendant.

"We also offer to show by him that in his connection with his knowledge of the subject, there is a general scientific recognition of such tests, and also that this machine is called upon, and this operator is called upon frequently by the various prosecuting authorities of the State of North Dakota to run tests where criminals are suspected."

The question of the admissibility of lie detector tests has arisen in a number of cases and the only reported case that has been called to our attention in which it is held that the evidence should be admitted was in People v. Kenny, 167 Misc 51, 3 NYS2d 348. The decision in that case was rendered by a trial judge and is the opinion of one judge. The decision in People v. Kenny has been criticized and said to be "historically untenable, factually incorrect, and legally reversible" by the writer of an elaborate article on "The Lie Detector and the Courts" in 16 NY Univ Law Quart Rev 202. In the reported cases of the courts of last resort the courts have rejected the evidence of a lie detector test on the ground that the reliability of the tests has not yet been sufficiently established. People v. Becker, 300 Mich 562, 2 NW2d 503, 139 ALR 1171 and note on page 1174; Boeche v. State, 151 Neb 368, 37 NW2d 593; 20 Am Jur Evidence, Sec 762, p 633; State v. Bohner, 210 Wis 651, 246 NW 314, 86 ALR 611 and on p 616. It is true that in this State the lie detector has been utilized by police investigators but it has never been recognized that a lie detector test is admissible in evidence. So similarly the use of a lie detector by police officers has been recognized as of value by police investigators, although not available for judicial use as evidence in a court. 3 Wigmore on Evidence, 3rd ed, p 646. Obviously there is a wide distinction between using a lie detector for purposes of investigation and using the answers to questions propounded by the operator as evidence in court bearing directly upon the truthfulness of the statements made by the party who is being examined and as proof of guilt

or innocence in a criminal action. No error was committed in excluding this evidence.

Error is also assigned upon the ruling of the court in rejecting evidence offered on behalf of the defendant to show the result of a hypnotic examination of the defendant. The defendant called one Dr. Burgess as a witness. Dr. Burgess testified that he had attended and obtained degrees from certain colleges; also that he had graduated and had been awarded the degree of Master of Science from the University of Illinois and later the degree of Doctor of Philosophy by the University of Iowa; that in his university studies he specialized in the field of psychology; that he resides at Moorhead, Minnesota, and has resided there for some twenty-two years; that in his work he has consulted and advised with a number of medical doctors and dentists both in Minnesota and in North Dakota. The defendant offered to prove by Dr. Burgess that he for a number of years has been thoroughly familiar with hypnotism and is able to place a person in a hypnotic state; that he has practiced his profession in this respect for a number of years and that he has perfected it to such an extent that he is now giving instructions to doctors and dentists in regard thereto and in reference to the matter of anaesthesia for the purpose of having operations performed thereunder, also in connection with the treatment of certain disturbances of the body and mind; that he is able to place a person in a hypnotic trance, at which time the person loses all control of the conscious mind and is governed entirely by the subconscious mind; that when such party is in such a hypnotic trance and is being dealt with in the subconscious mind, the person has no control of the things being done from the standpoint of the conscious mind and must deal entirely with the subconscious mind; that on the 26th day of November 1948, he placed the defendant in a hypnotic trance in a room at the Wahpeton Hotel and kept him in such trance for a long period of time; that at the time the defendant was thoroughly subjected to inquiry on all phases of the matter involved in this action for the purpose of ascertaining whether he was, in fact, telling the truth or whether he was guilty of the charge in the information; that

in connection with these tests, Dr. Burgess, himself, having placed him in the hypnotic trance asked him a number of questions in regard thereto and that in the presence of Dr. Burgess two of defendant's counsel asked him a number of questions; that he was taken out of the trance and later placed back in the trance on three occasions; that they invited the attorneys for the State to come to the hotel and ask the defendant any questions they wanted to or make any examination that they wanted to of him in regard to any matters, which invitation counsel for the State did not accept; that they offered to show that in the course of examination of the defendant while in hypnotic trance "that all questions propounded had to do with this case, or matters for the purpose of testing him; that every phase of this case was covered; that all of the matters pertaining to his guilt were inquired into; that full and complete questions were propounded to him on every phase of the matter of the administration of poison, whether he killed his wife, whether he had anything to do with the crime; and we would show by the examination of this witness that all of his answers were to the effect that he was innocent." They also offered to show that the questions and answers during the course of the examination were recorded by wire recorder and that they would identify such recordings and offer them in evidence. They further offered to show that by virtue of the long study that Dr. Burgess "has made, by virtue of his learning and training, by virtue of his study and the scientific use of the method made that in the case of an individual in a hypnotic state the truthfulness of the individual can be ascertained; that the Doctor is familiar with the effect of the running of these tests and that from his knowledge of this subject is able to testify as to the truthfulness of the answers given by the defendant in the hypnotic state. If the Court please, we would, through this matter and by this offer, offer to prove that all of the tests run upon this defendant at the time and in the manner aforesaid, clearly disclosed that the defendant was in no way guilty of this crime, and that his answers in all respects negatived the commission of any crime and clearly showed he was innocent." The court sustained objections to the

offer of proof and rejected the testimony. No case has been cited by either party relating to the admissibility of the evidence proffered and no case has been found. We think that the evidence was clearly inadmissible and that no error was committed in sustaining the objection.

Error is assigned on the ruling of the court in admitting certain evidence relating to an experiment made by Dr. Abbott with plaster of paris and strychnine. As has been shown Lydia Witt testified that the defendant in her presence mixed strychnine with plaster of paris and water and formed what resembled pills or tablets somewhat similar to those which defendant's wife had been or was taking. The defendant denied that he made such pills or that he gave any to his wife. When Dr. Pierce was examined as a witness for the defendant, he was asked on direct examination by defendant's counsel if he had an opinion as to whether or not a pill made of plaster of paris which was permitted to harden and having strychnine in it as described would or would not be soluble in the stomach. Dr. Pierce answered, "I doubt if it would dissolve." He was then asked, "Why is that, Doctor?" To which he answered as follows: "Because the acidity there is not of sufficient percentage to cause disintegration of the calcium plaster of paris. In fact, from experience we find that it passes through the alimentary tract as a foreign body, or it may be caught there as a foreign body, causing partial obstruction." Dr. Abbott was later called as a witness by the State and was asked whether he had made any experiments with plaster of paris and strychnine to discover whether or not taken in the manner described the strychnine might be extracted or dissolved in the stomach or intestines. He answered this in the affirmative and was then asked what he did. Dr. Abbott answered:

"I made a mixture of strychnine and plaster of Paris and added enough water to make a paste, and divided it into lumps and let it set. These lumps were then tested; one of them, which I estimated to be about the equivalent in size to half a dozen tablets of the ordinary sleeping pill tablet size, placed in a test tube with distilled water and acidified slightly by considerably more than the acid of the stomach; in one test this was allowed to

remain for a three-hour period, which is about the time that food ordinarily would be expected to remain in the stomach; and then this solution was carefully examined to see whether it would respond to tests for strychnine."

He was then asked "what were the results?" and he answered as follows:

"I was able to extract strychnine from the solution less than, much less than a lethal dose. a little more than the average medicinal dose, while the quantity in the lump was three or four grains, I estimate, after mixing—a certain amount. I repeated the experiments; always some strychnine dissolved, but I was not able to obtain from these lumps more than this small fraction of the strychnine that I knew was in there. One experiment running for six hours instead of three."

The doctor was then asked whether the amount which he found and did extract was sufficient to produce convulsions. The court sustained an objection by defendant's counsel to this question so it was not answered.

Subject to certain limitations evidence of experiments made out of court are admissible, the matter resting in the discretion of the trial court. 22 CJS Sec 645, p 985. The evidence and the result of the experiment should be such as to enlighten and assist rather than to confuse the jury and the experiment should be made or shown to have been made under conditions and circumstances substantially similar to those prevailing at the time of the the occurrence involved. "It is not, however, necessary in order to render experiments permissible or to admit evidence of experiments made out of court that the conditions be identical with those existing at the time of the occurrence; it is sufficient if there is a substantial similarity." 20 Am Jur, Evidence, Sec 756, p 628. In this case the experiment was conducted under conditions that were more favorable to the defendants than if the experiment had been conducted under precisely the same conditions prevailing at the time of the occurrence involved, so far as that could be done. Dr. Abbott made a lump several times larger than the pill concerning which Dr. Pierce had testified. There was in this lump a very substantial quantity of strychnine, un-

doubtedly, much more than there could have been in the tablet or pill; and he placed the lump in a solution that was considerably more acidified than the acidity produced in the stomach. Notwithstanding this he testified that the strychnine extracted on leaving the lump in the solution for a period approximately the same as the pill would have remained in the stomach was much less than a lethal dose and little more than the average medicinal dose. We find no error in the admission of this testimony.

At the close of the State's case and again at the close of all the evidence defendant's counsel moved for a dismissal of the action on the ground that Lydia Witt was an accomplice and that there was not sufficient other evidence tending to connect the defendant with the commission of the offense to warrant the submission of the case to the jury. The statute relating to corroboration of the testimony of an accomplice invoked by the defendant reads as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof." NDRC 1943, 29-2114.

The corroboration of an accomplice required by the statute must tend to connect the defendant with the commission of the crime. It does not require the corroboration of every material fact testified to by the accomplice or that the corroborating evidence standing alone be sufficient to support a verdict of guilty. State v. Marcovitz, 63 ND 458, 248 NW 481. The corroboration may be by facts and circumstances as well as by direct evidence. State v. Todd, 62 ND 479, 244 NW 25. "It is not even necessary that such evidence establish a prima facie case." The requirement of the statute is that in order to warrant a conviction there must be evidence other than that provided by the testimony of the accomplice which "tends to connect the defendant with the commission of the offense." State v. Foster, 69 ND 428, 287 NW 517. If "an accomplice is corroborated as to some material

fact or facts the jury may from that infer he speaks the truth as to all." State v. Reilly, 22 ND 353, 133 NW 914; State v. Smith, 51 ND 130, 199 NW 187. The corroboration need not be conclusive. It is sufficient if the evidence of itself tends to connect the defendant with the commission of the offense charged.

"The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test." 2 Wharton's Criminal Evidence, 11th ed, Sec 754, pp 1271–1272.

"The sufficiency of corroborating evidence depends upon the particular facts of each case. The weight of the corroborating testimony and the question as to whether or not the testimony of the accomplice is so corroborated as to establish the connection of the accused with the crime charged are questions for the jury to determine." 2 Wharton's Criminal Evidence, 11th ed, Sec 754, p 1272.

In this case there is ample corroboration of the testimony of the accomplice. The undisputed testimony including the testimony of the defendant himself shows that on the evening of September 25, 1947, he came home in the evening about six o'clock or a little later. The testimony of Witt is to the effect that the defendant called him about seven o'clock and that he then went to defendant's house and that shortly after he reached there he observed the defendant giving medicine to his wife accompanied by the direction to take the pills, lay down and relax and go to sleep and that following this he gave her the pills and some water and that one of the pills was one of the so-called vitamin pills or capsules. The defendant himself testified that among the medicine he gave her that evening was one of the so-called vitamin pills or capsules. The defendant remained in the house with the others until his wife died sometime after one o'clock. He was present and clearly had the opportunity to give her the poison and the evidence shows that he did give her certain medicine including one of the so-called vitamin pills or capsules. The evidence shows that aside from the medicine

given by the defendant nothing was given to the deceased by anyone except the hypos given by the doctor. It seems clear from the evidence that the strychnine disclosed by the post mortem was received by Minnie Pusch that evening. The evidence shows without dispute the illicit relationship that had existed between the defendant and Mrs. Witt and which continued to exist after the death of Mrs. Pusch. We are agreed there is ample evidence corroborating the testimony of the accomplice tending to connect the defendant with the commission of the offense charged and of which he stands convicted. The record discloses that the trial court gave full and careful instructions on the question of corroborating evidence. These instructions were a complete and fair statement of the law and no exception was taken to any part thereof.

An incident occurred during the cross-examination of the defendant which gave rise to certain rulings which are assigned as error. The defendant was asked by counsel for the State if he had a conversation with one of his counsel in the county jail on a certain day. He was further asked if in that conversation the defendant did not say to his attorney "If I confess, will I get some of my money back?" Objection to the question was overruled and later after the evidence in the whole case had been closed and both the State and defendant had rested defendant's counsel moved for a mistrial on the ground that it was misconduct on the part of State's counsel to attempt to bring before the jury the alleged conversation between the defendant and his attorney. The motion for mistrial was denied and error is assigned upon the rulings of the court in permitting the question to be asked and in denying the motion for mistrial. In view of what transpired and the questions that present themselves we deem it best to set forth the entire record upon which the rulings challenged are predicated. On the cross-examination of the defendant the following proceedings were had:

"Q Where were you on the 16th and 17th of November, 1948?
A 16th and 17th of November, I don't know.
Q What?
A I don't recall.

Q You don't recall where you were on the 16th or 17th of November, 1948?

A Oh, in jail here.

Q In the county jail?

A Yes.

Q Do you know Mr. Elmer Jensen, the deputy sheriff?

A Yes.

Q Didn't you ask him that day to call up your lawyer, Mr. Johnson?

A I have asked him several times; I don't remember what dates that was.

Q You did ask him several times?

A Yes.

Q Do you remember Mr. Johnson coming up to see you on that day?

A I don't remember that it was on that day.

Q You wouldn't say that he didn't?

A No.

Q You had a conversation with him on that day?

A Yes.

Q Did you not in that conversation say to him this—now, I want you to listen to it carefully: 'If I confess will I get some of my money back?'

MR. DELL: Just a moment. Your Honor, I object to that as incompetent, irrelevant and immaterial, and improper, and it is unethical. And I don't like that kind of procedure.

MR. MURPHY: I object to counsel charging me with unethical—

MR. DELL: I claim it is, and I make the statement right here and now so there will be no misunderstanding.

MR. MURPHY: I deny it, and I say we are prepared to prove what we are asking this witness by competent testimony.

MR. DELL: That makes it necessary for Mr. Johnson to take the stand if they want—

MR. MURPHY (Interrupting) It won't, Mr. Johnson, anyway.

MR. DELL: We would like to bring in some of the conversations on the other side of the table—

894

MR. MURPHY: Go ahead.

MR. DELL: I am telling you—

(The Court raps for order.)

THE COURT: I think I will sustain the objection until you lay a little better foundation, Mr. Murphy.

MR. MURPHY: Well, I will try to do that.

Q Mr. Johnson came up to see you alone at times?

A Yes.

Q All right, now, the 16th or 17th of November you were in the county jail?

A Yes.

Q And he came up to see you in your cell in that jail?

A Yes.

Q And you had a conversation with him at that time?

A Yes.

Q And in that conversation did you not make the statement I have already made, with him?

A What was the statement, again, please?

Q 'If I confess will I get some of my money back?'

A What else was the conversation? What was connected—

Q You answer that question. I am not here to answer questions. I am asking you.

MR. DELL: This is highly improper, objectionable, I would like to know what they were doing down there in that jail when a lawyer was up there conferring with his client.

THE COURT: Well, I am rather inclined to sustain the objection in that it was perhaps a confidential statement to his lawyer.

MR. MURPHY: Well, if your Honor please, it was not confidential as to some third person who may have overheard it. Of course, the lawyer couldn't testify to it, that is clear, it would be confidential as far as he is concerned, but a third person who overheard it could testify to it; there is no confidential relationship there.

THE COURT: Well, lay the foundation a little better, then, as to the situation of the parties and so forth.

MR. MURPHY: Well, I have shown they were both in his cell in the county jail. Of course, he didn't know where this other person was. I can't ask this witness; he doesn't know. He didn't even know the person was there. I have shown the situation exactly as has been described to me.

THE COURT: I will overrule the objection.

Q You can answer that question, can't you, whether you said that or didn't say it?

A I have never said I was guilty.

Q That isn't the question. The last question was if you made the precise statement, 'If I confess will I get some of my money back?'

MR. DELL: Objected to again. May we have a standing objection to this, your Honor?

THE COURT: Yes, you may.

MR. DELL: The question is, 'Did you or didn't you?'

A I am just trying to think whether that was mentioned.

Q (By Mr. Murphy) Well you—

A (Interrupting) If I knew more of the conversation, it would probably come to me.

Q You think you might have said it, do you?

A I wouldn't deny it and I wouldn't say, 'Yes'; I don't recall it.

Q You won't deny making that statement?

A I won't deny it and I won't say, 'Yes,' because I don't know.

Q Do you recall having any conversation in which you used words like that: 'If I confess will I get my money back?'

A That is the reason why I would like to know more about the conversation. If I made a statement like that it would be in connection with doing it for Lydia Witt to get her out to the children.

Q If you made that statement, that is why you made it?

A Yes.

Q You did make some similar statement, didn't you?

A What was that?

Q The one I just asked you—didn't you make a statement like that?

A Not to my knowledge.

MR. MURPHY: That is all."

Following this cross-examination the defendant was interrogated by his own counsel as follows:

"Q (By Mr. Dell) Now, as long as they have gone into that matter, let's find out about this. Mr. Pusch, I will ask you if it isn't true that on several occasions Mr. Johnson talked to you and told you there was a lot of evidence here and tried to find out whether you were guilty?

A Yes.

Q And talked to you about pleading guilty even though you claimed you were not guilty, is that right?

A Yes.

Q And after I got into the case I talked to you about the matter, and I will ask you if I told you there was a lot of evidence here and you might be convicted and I suggested the possibility of pleading guilty and making some arrangement with the State?

A Yes.

Q And you insisted you were not guilty?

A Yes.

Q And finally you submitted to a lie-detector test, didn't you?

A Yes.

MR. MURPHY: Objected to as incompetent and improper in view of the Court's ruling.

THE COURT: I sustain the objection and strike it out, and I will caution the counsel that I have ruled on that matter.

MR. DELL: Yes, your Honor.

Q Now, I will ask you, Mr. Pusch, whether or not Mr. Johnson told you on several occasions that Mr. Forbes was trying to make a deal with him to get you to plead guilty to something so as to get this matter out of the way. Did you have some talks to Mr. Johnson about that?

A Not that I know of.

MR. MURPHY: What was that?

THE REPORTER: 'Not that I know of.'

Q Did he talk to you—did Mr. Johnson talk to you down there in the jail concerning some talks he had with Mr. Forbes?

A I don't recall that.

Q You don't recall that?

A No.

MR. DELL: That is all.

MR. MURPHY: That is all."

That is the entire record of what transpired upon the cross-examination and upon the re-direct examination which followed. The transcript of the trial further shows that after the case had been submitted to the jury the jury returned into court and the following proceedings were had:

"(Thereafter, and at 4:20 o'clock p.m. of the same day, the jury were returned into the court room in the custody of the bailiffs, and the following proceedings were had:)

(Present: Defendant Pusch; Attorneys Johnson and Forbes; Clerk Peschel.)

THE COURT: Let the record show the presence of the defendant and his counsel and the State's Attorney.

THE COURT: Members of the Jury, I understand that you have some question that you—

A JUROR: That is correct, your Honor. In the testimony day before yesterday, that would be Thursday, there was evidence introduced and we don't know whether it was accepted or stricken out, regarding conversation that was overheard by the deputy sheriff, Mr. Jensen, I believe, at the jail. Was that stricken out or was it carried on the record as such, regarding conversation he overheard?

THE COURT: Well, I think perhaps the best way for the Court to answer that is to have the reporter read that portion of the record to the jury.

THE JUROR: Yes.

THE COURT: And I will ask the reporter to read that portion of the record to the jury. The jury to listen carefully."

Thereupon the reporter read to the jury the entire record which has been set forth above including the cross-examination of the defendant and the questions that were asked him by his own counsel and his answers thereto immediately following the cross-examination. At the conclusion of the reading by the reporter the juror who had made the inquiry which resulted in the record being read by the reporter stated: "I think that will answer our question." The jury then retired for further deliberation.

Communications between an attorney and his client are privileged and the privilege extends to the testimony of the client and he cannot be compelled to testify as to what he communicated to his attorney in confidence or as to what was communicated to him by his attorney. 70 CJ Sec 544, p 403. An accused does not by becoming a witness waive the protection of the rule that a communication to him by his attorney is privileged. 3 Wharton's Criminal Evidence, 11th ed, p 2099. The objection was rather general in terms and was not based upon the ground that it called for a privileged communication. However, the question did call for a privileged communication between the defendant and his attorney and was objectionable on that ground and we think that notwithstanding its general character, the objection should have been sustained.

It is not every erroneous ruling relating to the admission or rejection of evidence or to a question that has been propounded to a witness or party which requires or justifies the appellate court in setting aside the verdict and reversing a judgment of conviction. In examining an assignment of error which shows that error was committed in permitting a question or questions to be asked of a witness there is placed upon the appellate court the further duty of determining whether the error or defects or exceptions did or did not affect the substantial rights of the parties. NDRC 1943, 29–2826; State v. Stepp, 48 ND 566, 569, 185 NW 812, 813; State v. O'Connor, 58 ND 554, 563, 226 NW 601; State v. Colohan, 69 ND 316, 324, 286 NW 888; State v. Gibson, 69 ND 70, 103–104, 284 NW 209. It has been said that

this is one of the most difficult problems which confronts an appellate court in reviewing a judgment of conviction in a criminal case that has been tried before a jury. People v. Purtell, 243 NY 273, 153 NE 72. Whether error in permitting a question to be asked has such effect depends among other things upon the answer to the question and the "narrowness of the issue" to which the proposed question relates. People v. Purtell, supra. Except in extreme cases improper cross-examination is not ordinarily a ground for reversal where the witness answered in the negative. Commonwealth v. Barronian, 235 Mass 364, 126 NE 833; People v. Thompson, 69 Cal App2d 80, 158 Pac2d 313; People v. Seiber, Cal, 257 Pac 64; Adams v. State, Ala, 31 S2d 99; People v. Walker, 88 Cal App2d 265, 198 Pac2d 534; Kennedy v. State, Okla., 65 Pac2d 792; State v. Lemke, Minn., 290 NW 307; State v. Miller, 177 Wash 442, 32 Pac2d 535. In this case the defendant did not answer the question in the affirmative but at the outset sought further information with respect to the conversation but his final answer when asked if he did make some similar statement was "not to my knowledge." That ended the cross-examination and although the defendant afterwards was examined by his own counsel on what is denominated a redirect examination no further questions were propounded to him by counsel for the State.

It will be noted that the questions propounded to the defendant by his counsel did not relate to the statement concerning which attorney for the State had inquired. The questions propounded to the defendant by his own counsel related to different conversations held at different times and covered a much wider range than did the question propounded by the attorney for the State. The defendant in response to the questions propounded to him by his own counsel testified that one of his own attorneys on several occasions had told him there was a lot of evidence and had tried to find out whether the defendant was guilty and had talked to him about pleading guilty and that his other counsel on other occasions had talked to him along similar lines, had told him there was a lot of evidence here, that he might be convicted and even suggested to the defendant the possibility of pleading

guilty and making some arrangement with the State and that notwithstanding all this the defendant insisted to his counsel that he was not guilty. These declarations of innocence on the part of the defendant thus introduced in evidence as a recital of confidential communications between the defendant and his counsel had behind them not only the force of the testimony of the defendant that they were made at the time and under the circumstances stated but also the implied corroboration of his counsel who propounded the question that the defendant had made such declarations of innocence at the times and in the circumstances described in the questions. The issue presented by the objectionable question on cross-examination was narrow. It related only to the one question to which no affirmative answer was given and to which the last answer given by the defendant was in the negative. The defendant's examination by his own counsel was not restricted to what had been brought out on cross-examination but the inquiry based upon the cross-examination was utilized as a means to reveal to the jury confidential communications between the defendant and his own counsel and the declaration of innocence made by the defendant in the course of such communications. In the very nature of things these declarations of innocence to which the defendant testified in response to questions by his own counsel must have been beneficial to the defendant and have tended to obviate and minimize or destroy any adverse effect created by the question which had been asked him on cross-examination.

It is contended that the inquiry made by the jury indicates that the jury attached much importance to the evidence adduced on the cross-examination. This does not follow. The jury did not inquire as to the evidence that had been adduced on the cross-examination. The juror who made the inquiry stated with respect to this evidence, "We don't know whether it was accepted or stricken out" and later "Was that stricken out or was it carried on the record as such?" That was the information which the members of the jury sought. It is only natural that jurors in the discharge of their duties in any case would be interested in knowing whether any evidence that had been offered

had or had not been stricken or was carried in the record, and when there was doubt concerning this on the part of the jurors or some of them it was, of course, only natural that they would seek information and ascertain what the fact was as to whether the evidence had or had not been stricken. In this case it was not strange that jurors might have been in doubt as to the status of this particular evidence. The trial court first sustained an objection to the question and later sustained another objection so it is wholly understandable that some juror or jurors might have had some doubt whether the testimony had or had not been stricken. Reference has been made to the fact that the attorney for the State made no attempt to establish by evidence that some third person overheard the alleged statement by defendant to his attorney. Leaving on one side all question as to the admissibility of such testimony it is apparent that the fact that the State failed to produce a witness to testify that he overheard the alleged statement by the defendant to his attorney was favorable to the defendant and tended to show that such testimony could not be produced.

"A conviction will not be reversed because of the admission of improper evidence unless the accused was prejudiced or harmed thereby or unless it appears that there was a miscarriage of justice." 24 CJS 944. When the record and the evidence in this case are considered it does not appear that there was a miscarriage of justice and it is difficult to see how the jury could have returned any other verdict than that which they did return. When everything that transpired upon the cross-examination of the defendant including the examination by defendant's attorneys is considered we do not think that the propounding of the question on cross-examination and the overruling of the objection thereto could have influenced the verdict.

Error is also assigned upon the denial of defendant's motion for a directed verdict. In this state a trial court is without authority to direct a verdict in a criminal action. State v. Dimmick, 70 ND 463, 296 NW 146. Furthermore, under the evidence in this case there would have been no basis for so doing if the court had had the power so to do.

It follows that the order denying a new trial and the judgment appealed from must be affirmed. It is so ordered.

NUESSLE, Ch. J., MORRIS and GRIMSON, JJ., concur.

BURKE, J. (dissenting)  I cannot agree that the error in permitting the prosecuting attorney to examine the defendant concerning a statement he purportedly made to his attorney was not prejudicial. The question asked was, "Did you not in that conversation say to him this—now I want you to listen to it carefully: 'If I confess will I get some of my money back?'" When the trial judge indicated that he would sustain an objection to the question because he thought it called for the disclosure of a confidential communication between attorney and client, the prosecuting attorney stated, "It was not confidential as to some third person who may have overheard it. Of course the lawyer couldn't testify to it, that is clear, it would be confidential as far as he is concerned, but a third person who overheard it could testify to it . . . . Of course he (the defendant) didn't know where this other person was. I can't ask this witness; he doesn't know. He didn't even know the person was there." When the objection was overruled, the defendant, upon several repetitions of the question made equivocal answers, such as, "I have never said I was guilty", "I wouldn't deny it and I wouldn't say 'Yes';" "If I made a statement like that it would be in connection with doing it for Lydia Witt to get her out to the children;" and "Not to my knowledge." The prosecuting attorney thereafter made no attempt to establish by any evidence his positive assertion that some third person had overheard the defendant make the statement.

The jury could justifiably, from the equivocal answers given by the defendant, have reached the conclusion that he had made the statement as alleged. They might unjustifiably have reached the same conclusion from the unsworn statement of the prosecuting attorney. Having reached the conclusion that the statement had been made, they might have drawn an inference of a consciousness of guilt on the part of the defendant from his use of the words "If I confess." From what transpired later in the

trial I am satisfied that some of the jurors, at least, did reach that conclusion and draw that inference.

After the case had been submitted to the jury and had been considered by them for four or five hours they returned into court and inquired concerning this testimony. The question was, "In the testimony day before yesterday, that would be Thursday, there was evidence introduced and we don't know whether it was accepted or stricken out, regarding the conversation that was overheard by the deputy sheriff, Mr. Jensen, I believe, at the jail. Was that stricken out or was it carried on the record as such regarding the conversation he overheard?" Thereupon the record of the incident was read to the jury.

I cannot agree with the majority of the court in holding that little weight is to be given to the fact that the jury returned into court to ask this question after considering the case for four or five hours. The majority considers that it does not follow from the fact that the jury made the inquiry that they attached much importance to the incident. They are no doubt correct in the sense that this conclusion does not follow inexorably to the exclusion of all other possible hypotheses.

In my view, however, the proper conclusion as to the importance the jury attached to the incident lies in the answer to the question, "What is the most reasonable inference to be drawn from what they said and did?" To me the answer to that question is clear. The inference which I consider, not only most reasonable, but the only reasonable one, is that some of the jury believed that the defendant had said to his attorney, "If I confess, will I get some of my money back?" and that they considered that the statement was some evidence of guilt. It is not reasonable to assume that jurors would interrupt their deliberations to inquire if evidence, which they did not believe or which they considered had no bearing on the case, was stricken from the record. I am satisfied that the examination of the defendant concerning this matter, erroneously allowed, contributed to the result of the trial, a verdict of guilty of murder in the first degree. It was therefore prejudicial.