STATE of North Dakota, Plaintiff
and Appellee,

v.

Gary Dean OLSON, Defendant
and Appellant.

Cr. No. 684.

Supreme Court of North Dakota.

March 14, 1980.

Cynthia A. Rothe, State's Atty., Cass County, for plaintiff and appellee State of North Dakota.

John E. Rowell, of Dosland, Dosland & Nordhougen, Moorhead, Minn., for defendant and appellant.

VANDE WALLE, Justice.

On December 5, 1978, Gary Dean Olson was convicted by a jury of the murder of Pollie Johnson. Olson appeals from the final judgment of conviction and sentence of life imprisonment entered on March 14, 1979. We affirm.

Olson raises three issues on appeal:

1. Did the district court err in refusing to grant Olson's motion for mistrial because of the misconduct of potential jurors?

2. Did the district court err in denying Olson's motion to preclude the State from eliciting testimony from Steven Skar concerning alleged admissions made by Olson?

3. Was the evidence at trial sufficient to support a verdict of guilty of the crime charged?

I

Olson was charged with the murder of Pollie Johnson in Cass County. Olson had previously been convicted of the murder of his wife in that county. See *State v. Olson*, 274 N.W.2d 190 (N.D.1978). Olson filed a motion for change of venue from Cass County in the then First Judicial District to Ward County in the then Fifth Judicial District, alleging that there existed in the First Judicial District so great a prejudice against him that he could not obtain a fair and impartial trial in the First Judicial District. The trial court denied the motion for a change of venue to Ward County but

ordered a change of venue from Cass County to Richland County. It reasoned that the relatively recent trial of Olson for the murder of his wife kept fresh the memory of the earlier death of Pollie Johnson and the active participation of the Fargo community in the Johnson murder investigation through the creation of a reward fund would complicate the jury-selection process in Cass County. Olson subsequently filed a new motion for change of venue from Richland County to Ward County. That motion was denied by the trial court and Olson petitioned this court in an original proceeding for an appropriate supervisory writ directing the trial court to grant his motion for a change of venue from Richland County to Ward County. This court agreed with the trial court's finding that a reasonable likelihood existed that Olson could not get a fair and impartial trial in Cass County, but, because the change of venue granted was from Fargo to Wahpeton, a distance of only 55 miles, and because affidavits were filed demonstrating that the same news sources that provided the pretrial publicity that tainted the possibility of Olson's receiving a fair trial in Cass County also provided news coverage to Richland County, we granted the petition and ordered the trial court to grant the motion for a change of venue to Minot. *Olson v. North Dakota District Court, Etc.*, 271 N.W.2d 574 (N.D.1978).

This background becomes important in considering Olson's first issue on appeal, i. e., whether or not the district court erred in refusing to grant Olson's motion for mistrial because of the misconduct of potential jurors.

The voir dire was conducted over a period of several days. It is apparent from the instructions and arrangements, which counsel for Olson requested and which the trial judge granted, that it was the object of defense counsel to prevent any person who had any knowledge of Olson's previous conviction for the murder of his wife from sitting on the jury. The trial judge, as requested, consistently admonished the po-

tential jurors that they were not to discuss the case among themselves or with others nor read newspaper accounts or listen to television or radio reports of the case. During the voir dire potential jurors were not permitted in the courtroom, but rather were called in for examination individually. It came to the attention of the trial court and counsel during the examination of a potential juror that, contrary to the trial court's instructions, certain other potential jurors awaiting examination were talking "about an ex-wife being killed, and they asked if it was the same person, and I said I didn't know. So they were just trying to see, put two and two together." Upon hearing that statement, Olson's counsel moved for a mistrial and challenged the entire jury panel. After considerable discussion as to the effect of a mistrial, including the attendant publicity which would be generated by the reasons for a mistrial and including a refusal by Olson to waive his right to a speedy trial, the trial court denied the motion for a mistrial and the challenge to the entire jury panel. In an attempt to purge from the jury anyone who had overheard the discussion in the jury room, the trial court excused all persons who were within possible earshot of the conversation.[1] An examination of the record in this instance reveals that the trial court was extremely careful to prevent any person from serving on the jury who had any knowledge of Olson's previous conviction of murder. Certain potential jurors who had such knowledge had already been excused for cause. Because the trial had been moved from Fargo to Wahpeton and then to Minot in order to obtain a fair and impartial jury, it was obviously the concern of Olson's counsel, the trial judge, and the prosecution that a jury be empaneled whose members were unaware of Olson's previous conviction.

A jury without any prior knowledge of the defendant or his previous activities is an ideal to strive for but it is not an absolute requirement for a fair and impartial jury. As we said in *Olson v. North Dakota District Court, Etc., supra*:

---

1. Not all potential jurors were required to remain in the jury room, but only those who it

appeared would be subject to examination that day.

"Nor do we find that the extensive news coverage given either of the two murder cases would alone justify granting Olson a new trial as juror exposure to news account of a crime with which defendant is charged does not alone presumptively deprive the defendant of a fair and impartial trial." 271 N.W.2d at 581.

See also *State v. Pusch*, 77 N.D. 860, 46 N.W.2d 508 (1950); *State v. Fujita*, 20 N.D. 555, 129 N.W. 360 (1910); *State v. Werner*, 16 N.D. 83, 112 N.W. 60 (1907).

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court held that the United States Constitution entitles a criminal defendant not to a trial by a body of jurors ignorant of all facts surrounding the case, but to an impartial jury which will render a verdict based exclusively on the evidence presented in court:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 722–723, 81 S.Ct. at 1642–1643, 6 L.Ed.2d at 756.

Olson does not, however, allege that the jury finally empaneled was tainted by knowledge of his previous conviction. Rather, he urges that by the court's excusing the potential jurors who participated in or might have overheard the conversation in the jury room, he was denied his right to a trial by a jury of his peers. He argues that it was not his fault that conversations occurred in the jury room in violation of the trial court's order nor was it his fault that such conversation tainted prospective jurors, resulting in several of them, including three or four thought by his counsel to be favorable, being excused for cause.

Olson's position is not well taken. After the trial court had denied the motion for mistrial and the challenge to the entire jury panel, the State moved to excuse for cause the two potential jurors involved in the discussion speculating on Olson's previous conviction as well as two other potential jurors who might have overheard that conversation. Olson's counsel was asked directly by the trial court whether they objected to excusing these potential jurors and Mr. Nodland, speaking for the defense attorneys, replied:

"Well, we're put in a quandary in terms of ideas. The correct way for me to say this would be is we are being asked now to participate in the selection of a fair jury from what we see as being an unfair process, and that's an impossible quandary. All I'm doing, for the record, I want the record to show that these three jurors, assuming they're not tainted, were among our highest—or three of those—were among the highest that we had evaluated, and we made evaluations independently, and then put them together and that was true for all three of us."

■ The potential jurors excused for cause might have been left on the jury because their knowledge, as revealed by examination of the potential juror reporting the conversation, could be nothing more than the knowledge which had been obtained from "common gossip." Knowledge obtained by jurors from "common gossip" does not automatically disqualify a juror. *State v. Fujita, supra.* The conversation reported did not rise to the magnitude of publicity and knowledge by potential jurors which led to moving the trial from Fargo to Wahpeton and subsequently to Minot. It was only the assumption, fostered by counsel for the defense, that any potential juror with knowledge of Olson from any source

was automatically disqualified that led to the attempt to obtain a panel of jurors who had no knowledge whatsoever of Olson and his previous conviction. As we have already observed, knowledge obtained from news coverage and "common gossip" does not automatically disqualify a person from serving as a juror. Thus, except for defense counsel's insistence on a panel of jurors who had no knowledge whatsoever of Olson or his previous conviction, the prospective jurors excused for this incident might have remained on the jury panel.

More important, however, Olson's argument presumes that he is entitled to a jury panel composed of specific persons he believes might be favorable to him. In support of this contention Olson cites *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). These cases hold that the systematic exclusion of women from jury lists is wrong. They do not, however, support Olson's position in this case. The only systematic exclusion of persons from the jury in this instance involved those persons who had any knowledge of Olson or his prior conviction. Exclusion of those persons was at Olson's insistence. Olson's position that he is entitled to specific jurors on the panel is not supported by law. Olson is entitled by constitutional standards of fairness to a panel of impartial jurors. *State v. Olson, supra.* He is not entitled to have particular individuals serve on the jury. In *State. v. Jones*, 193 N.W.2d 509 (Iowa 1972), the Supreme Court of Iowa, addressing this question, stated:

> "A litigant is not entitled to any particular jurors; he is only entitled to a fair and impartial jury, and no showing is made that the 26 jurors who were called and examined were not proper jurors." 193 N.W.2d at 513.

See also 47 Am.Jur.2d, *Jury*, § 27.

Elaborate procedures were used by the trial court to ensure that a fair and impartial jury was empaneled. There is no allegation that the jury finally empaneled was not fair and impartial.

The trial court did not err in refusing to grant Olson's motion for a mistrial.

## II

Prior to the beginning of the trial Olson moved to preclude the State from introducing testimony of Steven Skar concerning alleged admissions made by Olson. Skar and Olson were inmates at the State Penitentiary. Olson was incarcerated for the previous conviction of the murder of his wife. Skar was to testify that while he and Olson were engaged in conversation, Olson stated he had killed Pollie Johnson. The conversation took place at a dining room table in the State Penitentiary. The State indicated at the time the motion was heard that in presenting Skar's testimony it would not question him as to the circumstances under which Olson was alleged to have stated he killed Pollie Johnson; that is, the State would not attempt to question Skar as to the fact that both he and Olson were inmates of the State Penitentiary at the time of the conversation or that Olson was in the Penitentiary for the previous conviction of the murder of his wife. Olson argued that if Skar's testimony were to be admitted it would be necessary to call rebuttal witnesses who were also inmates at the State Penitentiary in order to prove that Olson did not make the statements attributed to him and that Skar had an ulterior motive for testifying as he did. That ulterior motive, according to Olson, was that Skar would receive special consideration and be released from the Penitentiary earlier than scheduled. In order to present this testimony and rebut Skar's testimony it would be necessary to reveal that both Olson and Skar were incarcerated in the Penitentiary. Because of the concern for bias and prejudice if the jury were to find out that Olson had previously been convicted of the murder of his wife, Olson contended that under Rule 403, N.D.R.Ev., Skar's testimony should be excluded.

The trial court denied Olson's motion to exclude Skar's testimony. Skar did testify, but the State did not question him as to the details surrounding his conversation with

Olson. Additional statements Olson made to Skar concerning the murder of Olson's wife were not introduced. Rebuttal witnesses did testify. It is clear from reading their testimony that the conversation between Skar and Olson did take place in the State Penitentiary and that Skar and Olson were inmates of the Penitentiary. The reason for Olson's incarceration at the Penitentiary was not revealed.

■ On appeal, Olson contends that the trial court's denial of his motion to exclude Skar's testimony was error because it forced him to reveal through rebuttal witnesses that he was in the Penitentiary at the time of the conversation about which Skar testified. As he did at the time of the motion before the trial court, Olson argues that under Rule 403, N.D.R.Ev., Skar's testimony should have been excluded. That rule provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The question of balancing the probative value against the risk of unfair prejudice is one for the trial judge to resolve in the sound exercise of his discretion. We must determine whether or not the trial court abused its discretion in refusing to exclude Skar's testimony. *State v. Houghton,* 272 N.W.2d 788 (S.D.1978).

According to Olson, the prejudice arises from being forced to reveal that he, at the time of the alleged admission, was an inmate of the State Penitentiary. He observes, correctly, that one does not become an inmate of the Penitentiary without first having been convicted of a felony; that, accordingly, the jury was informed in a roundabout way that Olson was a felon, and that it is but one small step from that knowledge to a presumption that Olson was predisposed to commit the crime with which

he was charged.[2] In support of his argument, Olson cites *United States v. Robinson,* 544 F.2d 611 (2d Cir. 1976). In that case the Circuit Court of Appeals held that evidence of the defendant's possession of a gun at the time of his arrest for bank robbery, ten weeks after the bank robbery, should be excluded because the slight probative value was insufficient to outweigh the danger of unfair prejudice where the jury could conclude that a possessor of a gun is a dangerous person who ought to be segregated from society.

The decision in *United States v. Robinson* was a panel decision. The Second Circuit Court of Appeals subsequently granted rehearing of the appeal *en banc* in order to consider the recurring questions of when evidence of a defendant's possession of a weapon at the time of arrest may properly be admitted under Rule 403, F.R.Evid., and what standard of review is to be applied in reviewing the trial court's exercise of discretion in balancing the probative value of such evidence against its prejudicial effect. The court subsequently reversed the decision upon which Olson relies, stating:

"We vacate the panel judgment and decision, and hold that upon a charge of armed robbery evidence of the defendant's possession at the time of arrest of a weapon similar to that shown by independent proof to have been possessed by him at the time of his participation in the alleged crime may be introduced and that the district court's admission of the evidence should not be disturbed for abuse of discretion in the absence of a showing that the trial judge acted arbitrarily or irrationally. Under this standard the conviction here must be affirmed." *United States v. Robinson,* 560 F.2d 507, 509 (2d Cir. 1977), *cert. denied* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

Olson has cited no other cases in support of his position nor have we found any cases in which testimony that a defendant directly admitted commission of the crime was

---

**2.** Olson does not contend that Skar's testimony was not admissible under Rule 404(b), N.D.R. Ev., although he does refer to "predisposition" to commit the crime. There was no evidence of any nature introduced to indicate that Olson was incarcerated for the crime of murder.

excluded because such evidence was prejudicial. Testimony of the defendant's admission has substantial probative value. The prejudice which might result because the jury would learn that Olson was incarcerated in the Penitentiary does not "substantially outweigh" the probative value of that admission. Persons are incarcerated in the Penitentiary for nonviolent as well as for violent crimes. No mention was made to the jury of the crime for which Olson was incarcerated. As the State in argument pointed out, the jury could have thought that incarceration was due to the pending trial on the charge of killing Pollie Johnson.

The record reveals that the trial court carefully considered the prejudicial effects of the testimony of Skar. Olson's motion for a new trial included this issue, among others. In its opinion denying the motion for new trial the trial court observed that Skar's testimony was extremely relevant—not only because of the admission but because of the fact that Skar was from the West Fargo area and knew the family of Pollie Johnson. The trial court observed that Skar would have had more reason to come forth with the truth than other prisoners who knew Olson, and concluded:

> "It was important that the jury receive his testimony for consideration along with all the other evidence adduced by the prosecution. What weight should be given the testimony was for the jury to decide."

█ Olson concedes that the testimony given by Skar was relevant to the issues under consideration. However, he argues that Skar's testimony was inherently untrustworthy and therefore the probative value of Skar's testimony was minimal and was substantially outweighed by the danger of unfair prejudice. Olson's argument necessarily involves the credibility of Skar as a witness versus that of the rebuttal witnesses, who testified they had not heard Olson state he had killed Pollie Johnson and further testified that Skar's testimony was an attempt on his part to secure an early release from the Penitentiary. In a jury trial the credibility of the witnesses is for the jury to determine. *State v. Engel*, 289 N.W.2d 204 (N.D.1980); *State v. Olson, supra*. It would have been improper for the trial court to exclude Skar's testimony on the alleged ground that it was inherently untrustworthy.

A review of the record illustrates that prior to ruling on Olson's motion to exclude Skar's testimony the trial court was assured by the State that it would not question Skar as to any statements Olson might have made concerning the murder of his wife. The State did not, in questioning Skar, elicit any information that would indicate he and Olson were inmates at the Penitentiary. It is probable that in order to rebut Skar's testimony it was necessary for Olson's defense counsel, in cross-examining Skar and in examining their own rebuttal witnesses, to reveal that Skar and Olson were incarcerated in the Penitentiary at the time of the conversation. However, none of the testimony indicates that Olson was incarcerated because of his previous conviction of murder. The probative value of Skar's testimony was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in refusing to exclude Skar's testimony.

### III

Finally, Olson argues that the evidence presented at the trial was not sufficient to support a verdict of guilty of the crime charged. The evidence upon which the jury returned a verdict of guilty was mostly circumstantial. Before we consider the factual evidence adduced at the trial we briefly review the functions of this court on appeal where a defendant alleges insufficiency of the evidence to support a verdict of guilty.

█ A verdict based upon circumstantial evidence carries the same presumption of correctness as other verdicts and will not be disturbed on appeal unless the verdict is unwarranted. *State v. McMorrow*, 286 N.W.2d 284 (N.D.1979); *State v. Rieger*, 281 N.W.2d 252 (N.D.1979); *State v. Allen*, 237 N.W.2d 154 (N.D.1975). Circumstantial evidence alone may justify a conviction if it is

of such probative force as to enable the trier of fact to say that the defendant is guilty beyond a reasonable doubt. *State v. McMorrow, supra; State v. Erickson*, 231 N.W.2d 758 (N.D.1975). At the trial court level, circumstantial evidence must be conclusive and must exclude every reasonable hypothesis of innocence, but on the appellate court level the role of the Supreme Court is to merely review the record to determine if there is competent evidence that allowed the jury to draw an inference reasonably tending to prove guilt and fairly warranting a conviction. *State v. McMorrow, supra; State v. Allen, supra.*

In *State v. Olmstead*, 246 N.W.2d 888 (N.D.1976), a convicted defendant appealed on the ground that the evidence was insufficient as a matter of law to sustain his conviction. Rejecting that argument, this court summarized its function on review and wrote:

"If we were to judge from the cold print, we might decide many cases differently than trial judges do, and this case might be one of them. But, if we decided differently, we would have no assurance that ours was the better decision. We are reluctant to reverse factual findings of juries or trial judges. Appellate courts have stated in many ways, in both civil and criminal cases, their determination to give respect to the findings of trial judges and juries. Sometimes they say they will not reverse if there is substantial evidence to support the verdict [*Kresel v. Giese*, 231 N.W.2d 780, 791 (N.D. 1975)]; sometimes they say they will not substitute their judgment for that of the trial court or jury [*State v. Champagne*, 198 N.W.2d 218, 226 (N.D.1972)]; sometimes they speak of viewing the evidence in the light most favorable to the judgment [*State v. Neset*, 216 N.W.2d 285, 290 (N.D.1974)]; and sometimes they speak of their great reliance on the findings of the lower court [*In re Estate of Elmer*, 210 N.W.2d 815, 819 (N.D.1973)].

"In criminal cases we have repeatedly held that 'at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' *State v. Kaloustian*, 212 N.W.2d 843, 845 (N.D. 1973), and cases cited therein; *State v. Neset*, 216 N.W.2d 285, 287 (N.D.1974).

"However stated, these rules indicate a recognition that the truth can better be determined in the confrontation of the testimony of witnesses appearing in person than from a transcript of the testimony of those witnesses.

"Whichever formulation of the rules is followed, we conclude that the determination of the guilt of the defendant in this case was a question for the trial judge and that there was competent and substantial evidence to support it, and, although we are disturbed by the conflict in the evidence, we cannot say that we are left with a definite and firm conviction that a mistake has been committed. *Scheid v. Scheid*, 239 N.W.2d 833 (N.D. 1976); *Schwartzenberger v. Hunt Trust Estate*, 244 N.W.2d 711 (N.D.1976); *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519 (N.D.1976)." 246 N.W.2d at 890.

Turning to the record we find the evidence shows that Pollie Lynn Johnson was murdered on the evening of August 6, 1976, in the kitchen of her family's home located in a rural area north of the city of West Fargo. She was alone in the home at the time of the slaying. During the evening, at approximately 7:45 p. m., Kelly Rodgers called Pollie at her home. At about 8:15 p. m., Pollie's mother called her. At 8:50 p. m., Kelly Rodgers again called Pollie. The telephone rang several times before the receiver was picked up, hung up, and then picked up again. Kelly testified to that telephone call as follows:

"I called Pollie again and I never really talked to her. The voice that picked up the phone was real sluggish, panting noise, and the phone hung up again, and was picked up and I asked who was there on the other end of the line and the voice said, 'Kelly.'"

Kelly tried several more times to call the residence but was unable to get an answer. He then went to the grocery store that the Johnson family operates in West Fargo and told Pollie's mother what had happened. Mrs. Johnson suggested Kelly go to the family residence. When he arrived there he found Pollie's body lying in the kitchen with a substantial amount of blood around the head. He found no pulse or respiration. He then called Pollie's father, the sheriff's office, and the ambulance.

Upon arrival the investigating officers found nothing missing from the home, although cash receipts from the grocery store as well as a substantial number of firearms were kept in the home by Pollie's father, a member of the North Dakota Highway Patrol. His patrol car was parked in the yard. Other than the scene in the kitchen there was apparently no disturbance within the rest of the home. Further investigation determined that Pollie Johnson died of two gunshot wounds to the head. Additionally, there was a sharp, straight cut in the scalp, bruises in the tissue over the bases of the fingers and the back of the left hand, and a broken bone in the hand. A spent cartridge was found lying on the floor near Pollie's body, and the autopsy also revealed a portion of a lead slug within Pollie's brain. There was no evidence of sexual contact. After an investigation lasting many months and involving a number of suspects, a criminal complaint charging Olson with Pollie Johnson's murder was signed on December 15, 1977.

The evidence introduced at the trial shows that on August 6, 1976, the day of Pollie Johnson's murder, Olson left his employment at O'Day Equipment Company. A number of persons testified they saw a car parked near the Maple River bridge nearby during the afternoon and evening hours of August 6, 1976. Although there was some conflict in the testimony as to the exact color of the car, the make, and whether or not it was a two-door or four-door car, the general description of the car was similar to the vehicle Olson owned, a 1966 tan Plymouth. There was a deadfall across the Sheyenne River approximately 450 yards west of the Johnson home. Footprints were found near the deadfall.

Significantly, a firearms expert testified that the cartridge recovered at the scene of the murder was fired by the same weapon, to the exclusion of all other weapons, as one group of six spent cartridges and another group of 31 spent cartridges. The six cartridges were recovered from a 1961 Rambler previously owned by Olson and found at a salvage yard in Valley City, North Dakota, on June 22, 1977. The group of 31 cartridges was recovered from a 1970 Hornet previously owned by Olson and purchased from him by Robert Amundson on July 23, 1976. Olson's brother, Robert Olson, testified that he purchased a .22-caliber rifle on April 21, 1973, and shortly thereafter lent the rifle to Gary Olson, who kept the rifle in his possession, although Gary Olson told Robert Olson in January or February of 1977 that he had sold the .22 rifle. Robert further testified he recalled hunting with his brother, Gary, from Gary's Rambler.

Orvin Olson, another brother of Gary, testified that sometime before the 10 o'clock news on the evening of August 6, 1976, Gary Olson talked to him at the Wonder Tavern in Sheldon, North Dakota. Gary told Orvin that a girl had been killed and that she had been raped and beaten first and that he, Gary, had observed all this through the screen door of the house where he had gone to get a drink. Orvin testified Gary told him the girl was shot twice by three men who were looking for guns; that Olson's rifle was used and it was taken from his car. Orvin further testified that a report of the murder was aired on the 10 p. m. news, although he later admitted he was obviously mistaken because no report of the murder was aired on the news that night.

Oliver Wright, a construction equipment operator, testified that on the night of the murder he was in the Lariat Bar in West Fargo, seated at a table, when three other men came in and sat down at his table at about 9:30 p. m. He further testified one

of the men pulled a knife on him but put it away when Wright bought a round of drinks; that the man who pulled the knife on Wright told him he had killed a little girl about six miles north of West Fargo, but that one of the other men corrected him and said the girl was about sixteen years old. Wright testified the three appeared to be "high" on drugs. Wright notified the sheriff of what had happened a few days later after he learned of the Pollie Johnson murder through an appeal on television by the sheriff for information on the murder.

Steven Skar, an inmate at the State Penitentiary, testified that at noon meal at the Penitentiary on February 7, 1978, Olson stated he had killed Pollie Johnson; that in a later conversation he asked Olson what he did with the gun and Olson told him he had sold the gun a long time ago and that if they were going to convict him of the murder "they'd have to dig up the gun." Skar testified he knew Pollie Johnson and had gone to school with the children in the Johnson family. Skar admitted to using drugs. Lesley Johnson and Bruce Wrolstad, also inmates at the Penitentiary, contradicted Skar's testimony and further testified that Skar had asked them if they would back up his story about Olson.

Olson was charged with the murder of Pollie Johnson under Section 12.1–16–01, N.D.C.C., which at the time provided, in part:

"A person is guilty of murder, a class A felony, if he:

"3. Acting either alone or with one or more other persons, commits or attempts to commit . . . burglary, . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of any person; . . ."

Olson's first argument concerning the evidence is that it is insufficient to prove beyond a reasonable doubt the crime of burglary because the evidence discloses that nothing was missing from the house and that there were no signs of forced entry into the house.

The statute does not require that something must actually have been taken in order for a burglary to have been committed. The statute does provide that a person is guilty of murder if he "commits or attempts to commit . . . burglary, . . . and, in the course of and in furtherance of such crime . . . causes the death of any person; . . ." Furthermore, forceable entry is not a necessary element of the crime of burglary as defined by our statutes. Section 12.1–22–02, N.D. C.C., provides, in part:

"1. A person is guilty of burglary if he willfully enters or surreptitiously remains in a building or occupied structure, . . . when at the time the premises are not open to the public and the actor is not licensed, invited, or otherwise privileged to enter or remain as the case may be, with intent to commit a crime therein."

Although not overwhelming, there is sufficient evidence in the record from which the jury could reasonably infer that a burglary was in progress at the time Pollie was murdered and that the burglary was interrupted by the telephone calls from Kelly Rodgers and Pollie's mother.

Olson also argues, however, that because there were no signs of forced entry into the house and that because neither of Pollie's parents testified that Olson did not have their consent to enter the premises, there is insufficient evidence to prove the crime of burglary. In support of his contention Olson cites *Williams v. State*, 429 S.W.2d 503 (Tex.Crim.App.1968), and *Wilson v. State*, 168 Tex.Cr.R. 420, 328 S.W.2d 305 (1959).

An examination of the *Williams* case does indeed reveal that the Texas Court of Criminal Appeals reversed a conviction because of insufficient evidence to sustain the conviction. However, the opinion reflects that there were other witnesses who could have testified that the defendant, Williams, had been in the apartment he was accused of having burglarized but they were not

called. The decision indicates that the want of the owner's consent to either the entry or the taking of any property should be proved by the State but that the facts may be proved by circumstantial evidence where that is the only evidence available. The *Williams* opinion cited the *Wilson* decision, wherein the Texas court, relying upon a series of former decisions, held that want of consent of the person alleged to be the owner may not be proved by circumstantial evidence if the owner is available to testify on the question. That apparently has been the rule in Texas since 1905. See *Mitchell v. State,* 166 Tex.Cr.R. 291, 313 S.W.2d 286 (1958).

 We have found no cases in North Dakota which have adopted this rule for use in North Dakota, and we decline to do so now. Rather, we conclude that the element of entry for the purpose of committing a burglary may be proved by circumstantial evidence in the same manner as any other elements of the crime. *State v. Johnson,* 231 N.W.2d 180 (N.D.1975); *State v. Bone,* 201 N.W.2d 80 (Iowa 1972). The evidence introduced indicated that the Johnson family and Olson did not know one another. The jury could have found from the evidence introduced that Olson did not have the consent of any of the Johnson family to enter the house.

Because Wright's testimony substantiates the statement which Gary Olson gave his brother, Orvin Olson, i. e., that the murder was committed by three other men, Olson argues the evidence indicates he was an unwitting party accidentally present at the scene whose gun was used against his consent and who was told to dispose of the gun on pain of revenge being taken against his family and himself. He argues that this explanation is more probable and that he was framed because of the threats against his family.

 This argument was brought out in the trial by both the evidence and the closing arguments of Olson's counsel. It thus became a matter for the jury to consider and, in making its decision, it was the jury's function to determine the credibility of the witnesses. Although all the evidence in a case is circumstantial, the State is not obliged to negate every reasonable theory consistent with the defendant's innocence. See *People v. Walker,* 93 Mich.App. 189, 285 N.W.2d 812 (1979). The jury did believe the evidence introduced by the State and it is not our prerogative to resolve conflicts in the evidence, pass on the credibility of the witnesses, or weigh the evidence. See *State v. McDaniel,* 205 Neb. 53, 285 N.W.2d 841 (1979).

We find upon reviewing the evidence in the light most favorable to the verdict that the jury could have concluded that Olson was in the vicinity of the Johnson home on the day of the murder of Pollie Johnson; that he observed the Johnson home for a period of time and determined that the family had left the premises; that he approached the home with the intent of burglarizing the home for the purpose of obtaining firearms or money; that he was surprised when entering the home to find Pollie there, and, after the telephone call from her mother, became frightened he would be discovered and killed Pollie Johnson. Although the circumstantial evidence of guilt is not overwhelming, the testimony that the spent cartridge by the body of Pollie Johnson had been fired from the same weapon which fired several of the cartridges found in two cars previously owned by Olson is substantial. Olson's admission that he killed Pollie Johnson was further evidence to be weighed and considered by the jury.

We have examined the entire record and we conclude that the evidence supports the verdict, that there are no other grounds for reversal, and therefore the judgment of conviction must be affirmed.

ERICKSTAD, C. J., PEDERSON and SAND, JJ., and BENNY A. GRAFF, District Judge, concur.

GRAFF, District Judge, sitting in place of PAULSON, J., disqualified.